UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTISAR R. NA'IM,            )
                            )
            Plaintiff,       )
                            )
        v.                   )    C.A. No. 06-2237 (RMU)
                            )
CONDOLEEZZA RICE,            )
Secretary of State,          )
                            )
            Defendant.       )
                            )
_____ )

<u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56, defendant, by her under-signed attorneys, hereby moves this Court for an order granting summary judgment in her favor.  No genuine issue as to any material fact exists as to the claims being made by plaintiff, and defendant is entitled to judgment as a matter of law.  As set forth in the Court's scheduling order, this is an "early" summary judgment motion, in that defendant submits that the motion can be decided without further discovery.

In support of this motion, the Court is referred to the accompanying statement of material facts as to which there is no genuine issue and to the accompanying memorandum of points and authorities.  A draft order reflecting the requested relief is also attached.

Respectfully submitted,

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney
          /s/
FRED E. HAYNES, DC Bar #165654
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
202.514.7201

OF COUNSEL:

Kathryn N. Skipper
Attorney Adviser
Department of State
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTISAR R. NA'IM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-2237 (RMU) |
| | ) | |
| CONDOLEEZZA RICE, | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

DEFENDANT'S STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>

Pursuant to LCvR 56.1, defendant submits this statement of material facts as to which there is no genuine issue.  The exhibits that are referred to in this statement are attached to the memorandum in support of defendant's motion for summary judgment.

1. Plaintiff states that she became employed by the State Department in about 1991.  R.1, Complaint, ¶ 6.

2. In 1997, plaintiff was assigned to a new position at the State Department's Freedom of Information Office.  <u>Id.</u>

3. Plaintiff subsequently filed a series of equal employment opportunity complaints relating to her employment there.  <u>See</u> Exhibit A (declaration from Jacqueline Canton, a supervisor in the State Department's Office of Civil Rights) ¶¶ 4-6.

4. Plaintiff first filed an informal complaint of discrimination in 2001 (EEO Case No. I/57-01).  This informal

complaint was mediated, and Ms. Na'im signed a Mediated Settlement Agreement on September 26, 2001.  Exhibit A, ¶ 4.

5. Plaintiff filed another informal complaint of discrimination in 2002 (EEO Case No. I/05-02).  This complaint was mediated, but the parties were unable to resolve their dispute through mediation. Plaintiff did not proceed to file a formal complaint of discrimination and reprisal relating to this informal complaint.  Id.

6. Next, on November 19, 2002, plaintiff filed a formal EEO complaint, EEO Case No.03-09, alleging that she was discriminated against based on race (Afro-American), sex (female), religion (Islam), and reprisal when she was not selected for a GS-13 position in July 2002.  Exhibit A,¶ 5.

7. The State Department issued a final agency decision on July 26, 2005, finding no discrimination in EEO Case No. 03-09, and there is no record that plaintiff took further action with regard to this complaint.  Id.

8. Plaintiff next filed a formal complaint of discrimination on August 15, 2006 (EEO Case No. 092-06), alleging that she was discriminated against based on race (African-American) and reprisal when she was placed on a PIP and her 2005 performance rating was delayed.  Exhibit A, ¶ 6.

9. In EEO Complaint No. 092-06, plaintiff stated the following:

2

I underwent two EEO/ADR mediations under A-Bureau-IPS
management, first with the Director of IPS-Margaret P.
Grafeld and a second with supervisor, Tasha Thian.
And a pending lawsuit against that office, EEOC CASE NO.
100-2004-00074X, Agency No. 03-09 [1]. I allege that as a
result of that lawsuit and the two EEO/ADR's I continued to
experience reprisal from A/IPS management and personnel
officials up to the time of my departure from my former
office, and that they put me on an illegal Performance
Improvement Plan (PIP) to either terminate my job or
pressure me out of it. I alleged during both of these
mediations that I was not treated fairly in terms of my PE
ratings, did not receive interim progress reports on several
occasions, did not always receive my PE rating, was always
the last individual to receive a PE rating review at the end
of the review period, despite FAM 2825.6 & .7 regulations.
All of my other colleagues were given PE interim progress
reports and PE ratings on time. I was not. And, as for the
final 2005 PE rating period, I was not given an interim
progress report, and I was put in an illegal PIP first by
Tasha Thian and Charlene W. Thomas, which continued under
Mary Casto. I was not given a copy of my rating for this
period before or after I left that office. I was constantly
singled out and called into "PIP" meetings for case work
situations that were overlooked by IPS managers from other
colleagues. Everything that I did was scrutinized to try to
justify the termination of my job, including verbal threats
made by both Tasha Thian and Charlene W. Thomas that I would
be fired from my job if I did not "improve."

Exhibit A, ¶ 6.

10. This complaint was dismissed by letter dated September

28, 2006, because Ms. Na'im did not state actionable claims.

Exhibit A, ¶ 6.

11. Attached as Exhibit B to defendant's memorandum in

support of its motion for summary judgment is the declaration of

---

1. Although Ms. Na'im requested a hearing before an EEOC
administrative judge (EEOC Case No. 100-2004-00074X) in connection
with EEO case no. 03-09, she withdrew that request on April 12,
2005. Exhibit A, ¶ 5.

Melissa Lytell, the Chief of the Human Resources Division in the Office of the Executive Director of the Bureau of Administration at the State Department.  She is familiar with the 60-day performance improvement plan ("PIP") that plaintiff was placed on January 26, 2006.  Ms. Lytell signed the PIP as the Executive Director's designee.  Exhibit B, ¶ 2.

12. OPM regulations (5 C.F.R. § 432.104) provide the following about addressing unacceptable performance:

> At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical element(s), the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance requirement(s) or standard(s) that must be attained in order to demonstrate acceptable performance in his or her position.

Exhibit B, ¶ 3.

13. The State Department regulations at 3 Foreign Affairs Manual ("FAM") 2824.5 further provide the following:

> Unacceptable Performance
>
> a.   An employee performing at the Unacceptable level in one or more critical element(s) at any time during the performance appraisal period must be notified of the critical element(s) for which performance is Unacceptable and be afforded an opportunity period to improve.  He or she is placed on a Performance Improvement Plan, DS-1765, which consists of 45 calendar days or longer. Notification of Unacceptable performance can occur at any time during the appraisal cycle, including the end of the performance appraisal period.

4

> b.    At the conclusion of the opportunity
> period, if the employee's performance
> continues to be Unacceptable, action may be
> initiated to reduce in grade or remove the
> employee in accordance with 3 FAM 4550 and 5
> U.S.C. 4303.

Exhibit B, ¶ 3.

14. Plaintiff's supervisor, Tasha Thian, determined that plaintiff's performance was unacceptable during the January 1, 2005, to October 15, 2005, period and recommended, by a memorandum dated December 22, 2005, that plaintiff be placed on a PIP "to allow her an opportunity to  bring her performance to a satisfactory level."  Exhibit B, ¶ 5.

15. Effective January 26, 2006, plaintiff was placed on the standard PIP used by the agency for a 60-day period, i.e., until March 26, 2006.  Exhibit B, ¶ 6.

16. By that time, plaintiff had been identified to take a passport specialist position in another bureau, the Bureau of Consular Affairs.  Id.

17. A PIP only becomes part of the employee's performance file when an adverse action is taken – a reduction in grade or removal.  Exhibit B, ¶ 4.

18. The PIP was not placed in plaintiff's Official Personnel Folder, and it did not affect plaintiff's grade or salary.

Exhibit B, ¶ 7.

                              Respectfully submitted,

                              JEFFREY A. TAYLOR, D.C. Bar #498610
                              United States Attorney

                              RUDOLPH CONTRERAS, D.C. Bar #434122
                              Assistant United States Attorney
                                        /s/
                              FRED E. HAYNES, DC Bar #165654
                              Assistant United States Attorney
                              555 4th Street, N.W.
                              Washington, D.C. 20530
                              202.514.7201

OF COUNSEL:

Kathryn N. Skipper
Attorney-Adviser
Department of State
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
INTISAR R. NA'IM,                )
                                 )
            Plaintiff,           )
                                 )
      v.                         )   C.A. No. 06-2237 (RMU)
                                 )
CONDOLEEZZA RICE,                )
Secretary of State,              )
                                 )
            Defendant.           )
                                 )
_____ )
```

MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff, an African-American woman employed by the Department of State, alleges in her complaint three causes of action: the first is that her placement on a performance improvement plan (PIP) constituted race discrimination; the second is that placement on the PIP and statements in connection with that placement were part of a hostile work environment created by the State Department because of plaintiff's race; and the third is that placement on the PIP was an act of retaliation for her having earlier exercised her rights under Title VII of the Civil Rights Act of 1964. All three relate to her service in an office at the State Department that is involved in handling Freedom of Information Act and Privacy Act matters (hereafter referred to as the "FOIA Office"). As we explain below, there are fatal flaws to each of these counts that require dismissal of the case at this early stage in its life.

SUMMARY OF ARGUMENT

Our Court of Appeals has specifically held that being placed on a PIP does not qualify as an adverse personnel action that is actionable as race discrimination.  It follows that Count I should be dismissed.  Count II, which alleges that the PIP and statements related to its implementation were part of a hostile work environment, should be dismissed because plaintiff's administrative complaint of discrimination failed to give reasonable notice that she was pursuing a claim of hostile work environment.  Plaintiff's retaliation claim, Count III, should be dismissed because her placement on a PIP plan is too far removed in time from her earlier protected activity to be causally related to the earlier activity for purposes of establishing a prima facie claim of retaliation.

FACTUAL BACKGROUND

Plaintiff states that she became employed by the State Department in about 1991.  R.1, Complaint, ¶ 6.  In 1997, plaintiff was assigned to a new position at the State Department.  Id.  This was not, unfortunately, a match made in heaven, and plaintiff subsequently filed a series of equal employment opportunity complaints relating to her employment there.  Attached hereto as Exhibit A is a declaration from Jacqueline Canton, a supervisor in the State Department's Office of Civil Rights, setting forth the history of plaintiff's EEO complaints.

(Undersigned counsel, Fred E. Haynes, has redacted items from
Exhibit A and Exhibit B, _infra_, to insure compliance with the
privacy directives governing the filing of materials in the
public docket.  The redactions have been made in black ink.)

Plaintiff filed an informal complaint of discrimination in
2001 (EEO Case No. I/57-01).  This informal complaint was
mediated, and Ms. Na'im signed a Mediated Settlement Agreement on
September 26, 2001.  Exhibit A, ¶ 4.  Plaintiff filed another
informal complaint of discrimination in 2002 (EEO Case No. I/05-
02).  This complaint was mediated, but the parties were unable to
resolve their dispute through mediation. Plaintiff did not
proceed to file a formal complaint of discrimination and reprisal
relating to this informal complaint.  _Id._

On November 19, 2002, plaintiff filed a formal EEO com-
plaint, alleging she was discriminated against based on race
(Afro-American), sex (female), religion (Islam), and reprisal
when she was not selected for a GS-13 position in July 2002.
Exhibit A,¶ 5.  The State Department issued a final agency
decision on July 26, 2005, finding no discrimination.  There is
no record that plaintiff took further action with regard to this
complaint, _id.,_ and the time for doing so has expired.

Plaintiff next filed a formal complaint of discrimination on
August 15, 2006 (EEO Case No. 092-06), alleging that she was
discriminated against based on race (African-American) and

reprisal when she was placed on a PIP and her 2005 performance
rating was delayed.  Exhibit A, ¶ 6.  In her formal complaint,
plaintiff identified the acts that she believed were discrimin-
atory and retaliatory:

> I underwent two EEO/ADR mediations under A-Bureau-IPS
> management, first with the Director of IPS-Margaret P.
> Grafeld and a second with supervisor, Tasha Thian.
> And a pending lawsuit against that office, EEOC CASE NO.
> 100-2004-00074X, Agency No. 03-09 *[1]*.  I allege that as a
> result of that lawsuit and the two EEO/ADR's I continued to
> experience reprisal from A/IPS management and personnel
> officials up to the time of my departure from my former
> office, and that they put me on an illegal Performance
> Improvement Plan (PIP) to either terminate my job or
> pressure me out of it.  I alleged during both of these
> mediations that I was not treated fairly in terms of my PE
> ratings, did not receive interim progress reports on several
> occasions, did not always receive my PE rating, was always
> the last individual to receive a PE rating review at the end
> of the review period, despite FAM 2825.6 & .7 regulations.
> All of  my other colleagues were given PE interim progress
> reports and PE ratings on time.  I was not.  And, as for the
> final 2005 PE rating period, I was not given an interim
> progress report, and I was put in an illegal PIP first by
> Tasha Thian and Charlene W. Thomas, which continued under
> Mary Casto.  I was not given a copy of my rating for this
> period before or after I left that office.  I was constantly
> singled out and called into "PIP" meetings for case work
> situations that were overlooked by IPS managers from other
> colleagues.  Everything that I did was scrutinized to try to
> justify the termination of my job, including verbal threats
> made by both Tasha Thian and Charlene W. Thomas that I would
> be fired from my job if I did not "improve."

Exhibit A, ¶ 6.  This complaint was dismissed by a letter dated
September 28, 2006, because  Ms. Na'im did not state actionable
claims.  Exhibit A, ¶ 6.

Attached as Exhibit B hereto is the declaration of Melissa
Lytell, the Chief of the Human Resources Division in the Office

of the Executive Director of the Bureau of Administration at the State Department. She is familiar with the 60-day PIP that plaintiff was placed on January 26, 2006. Ms. Lytell signed the PIP as the Executive Director's designee. Exhibit B, ¶ 2.

Ms. Lytell explains that OPM regulations (5 C.F.R. § 432.104) provide the following about addressing unacceptable performance:

> At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical element(s), the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance require- ment(s) or standard(s) that must be attained in order to demonstrate acceptable perfor- mance in his or her position.

Exhibit B, ¶ 3.

The State Department regulations at 3 Foreign Affairs Manual ("FAM") 2824.5 further provide the following:

> Unacceptable Performance
>
> a.   An employee performing at the Unacceptable level in one or more critical element(s) at any time during the performance appraisal period must be notified of the critical element(s) for which performance is Unacceptable and be afforded an opportunity period to improve. He or she is placed on a Performance Improvement Plan, DS-1765, which consists of 45 calendar days or longer. Notification of Unacceptable performance can occur at any time during the appraisal cycle, including the end of the performance appraisal period.
>
> b.   At the conclusion of the opportunity

5

> period, if the employee's performance
> continues to be Unacceptable, action may be
> initiated to reduce in grade or remove the
> employee in accordance with 3 FAM 4550 and 5
> U.S.C. 4303.

Exhibit B, ¶ 3.

Ms. Na'im's supervisor, Tasha Thian, determined that Ms. Na'im's performance was unacceptable during the January 1, 2005, to October 15, 2005, period and recommended, by a memorandum dated December 22, 2005, that Ms. Na'im be placed on a PIP "to allow her an opportunity to  bring her performance to a satis-factory level." Exhibit B, ¶ 5.

Ms. Na'im was placed on the standard PIP used by the agency, effective January 26, 2006, for a 60-day period, i.e., until March 26, 2006. Exhibit B, ¶ 6.  By that time, plaintiff had been identified to take a passport specialist position in another bureau, the Bureau of Consular Affairs.  Id.  A PIP only becomes part of the employee performance file when an adverse action is taken – a reduction in grade or removal.  Exhibit B, ¶ 4.  The PIP was not placed in Ms. Na'im's Official Personnel Folder, and it did not affect Ms. Na'im's grade or salary.  Exhibit B, ¶ 7.

<u>ARGUMENT</u>

A.  <u>Placement On A PIP Is Not Actionable Under Title VII.</u>

As a general matter, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) she is a member of a protected group,

(2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir.2002) (citing McDonnell Douglas, 411 U.S. at 802). Additionally, there is considerable law in this Circuit on what counts as an adverse personnel action (also referred to as an adverse employment action) for the purposes of Title VII.

As explained in Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999), under Title VII there must be an injury, and therefore "[a]n employee must first be 'aggrieved' in order to bring an action." 199 F.3d at 455. In making this determination, a court should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating," not intermediate decisions "having no immediate effect upon employment decisions." Taylor v. FDIC, 132 F.3d 753, 764 (D.C. Cir. 1997).

Our Court of Appeals in Taylor v. Small, 350 F. 3d 1286 (D.C. Cir. 2003), has specifically held that being put on a PIP is not an adverse employment action for the purposes of establishing a prima facie Title VII discrimination claim. 350 F.3d at 1292-93. The PIP that plaintiff was placed on was a standard type of PIP used by the agency, and no adverse action resulted from the PIP. See supra, at 6. Under governing Circuit law, Count I should be dismissed.

7

B. <u>Plaintiff's Administrative Complaint Did Not Give Reasonable
Notice Of A Claim Of Hostile Work Environment.</u>

Compliance with the administrative procedures and timeliness
requirements of Title VII, and the regulations promulgated by the
EEOC, is mandatory.  "Complainants must timely exhaust these
administrative remedies before bringing their claims to court."
<u>Bowden v. United States</u>, 106 F.3d 433, 437 (D.C. Cir. 1997);
<u>Battle v. Rubin</u>, 121 F. Supp. 2d 4, 7 (D.D.C. 2000) ("a party
must timely file all applicable administrative complaints and
appeals in order to bring a claim in federal court"); <u>Williams v.
Munoz</u>, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely adminis-
trative charge is a prerequisite to initiation of a Title VII
action").  And as the Supreme Court reiterated in <u>National R.R.
Passenger Corp. v. Morgan</u>, 536 U.S. 101, 108 (2002) (<u>quoting</u>
<u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980)), "'strict
adherence to the procedural requirements specified by the
legislature is the best guarantee of evenhanded administration of
the law.'"

"A Title VII lawsuit following the EEOC charge is limited in
scope to claims that are 'like or reasonably related to the
allegations of the charge and growing out of such allegations.'"
<u>Park v. Howard University</u>, 71 F.3d 904, 907 (D.C. Cir. 1995)
quoting <u>Cheek v. Western and Southern Life Ins. Co.</u>, 31 F.3d 497,
500 (7th Cir. 1994).  When evaluating whether or not the Title
VII claim in court and the allegations made in the administrative

8

complaint are sufficiently related, the court asks whether or not the Title VII claims reasonably would have been encompassed within an administrative investigation responding to the EEOC charges. Park, 71 F.3d at 907.

A court's interpretation of an administrative charge cannot be so liberal that a litigant is allowed to bypass the statutorily mandated administrative process. Park, 71 F.3d at 907. The purpose of the exhaustion requirement "is to afford the agency an opportunity to resolve the matter internally and to avoid unnecessarily burdening the courts." Wilson v. Pena, 79 F.3d 154, 165 (D.C. Cir. 1996). The goals underlying the exhaustion requirement "would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship." Park, 71 F.3d at 908 quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992).

When a plaintiff's administrative charge does not contain a hostile work environment or harassment claim or factual allegations supporting such a claim, the litigant cannot add a hostile work environment claim to her complaint in a civil suit. Park, 71 F.3d at 909; see also Christopher v. Billington, 43 F.Supp.2d 39, 47-48 (D.D.C. 1999) (holding that an EEO complaint limited to claims of sex discrimination is insufficient to support a claim of a hostile work environment in a subsequent civil suit). In

9

<u>Park</u>, the plaintiff's administrative complaint alleged sex and national origin discrimination when she was not selected for a position, but she did not include a claim of a hostile work environment in her administrative complaint.  <u>Id.</u> at 906.  The Court held that "[b]ecause [plaintiff's] EEOC charge contained no claims or factual allegations that could reasonably be expected to lead to a hostile work environment claim, we hold that she failed to exhaust her administrative remedies for such a claim at the EEOC."  <u>Id.</u> at 909.  The Court, therefore, barred the hostile work environment claim.  <u>Id</u>.

As described above, at 4, the administrative claim filed in this case made two allegations: that (1) plaintiff's placement on a PIP and (2) the delay by the agency in providing her with performance evaluations constituted a violation of Title VII. Nowhere is the term hostile work environment or harassment used. Additionally, and of determinative significance here, the conduct alleged in the administrative complaint is not on its face conduct that would support a finding of a hostile work environment.

Courts have recognized a claim based on a hostile work environment where workplace conditions are "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the terms and condos- tigons of employment."  <u>Oracle v. Sun downer Offshore Services,</u>

10

Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Systems, 510 U.S. 17, 21 (1993)); Stewart v. Evans , 275 F.3d 1126, 1133-34 (D.C. Cir. 2002).  In determining whether an actionable hostile work environment claim exists, courts are to consider the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.  See Farragei v. Boca Raton, 524 U.S. 775, 787-88 (1998).

This Court, and others, have been reluctant to transform a series of alleged disparate acts of discrimination into a hostile work environment claim.  Lester v. Natsios, 290 F.Supp. 2d 11, 32-33 (D.D.C. Oct. 7, 2003), citing Gardner v. Tripp County, South Dakota, 66 F. Supp. 2d 1094, 1100-1101 (D.S.D. 1998) and Parker v,. Delaware, Dept of Public Safety, 11 F. Supp. 2d 467, 475 (D. Del. 1998).  "Discrete acts constituting discrimination or retaliation claims...are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." 290 F.Supp. 2d at 33.

Even accepting as true for purposes of this argument that everything plaintiff alleges happened just as she describes it, plaintiff cannot show, as to Count II, that she was subjected to working conditions permeated with discriminatory intimidation, ridicule, and insult.  Rather, the alleged acts are nothing more than run-of-the-mill alleged separate acts of discrimination –

11

placement on a PIP and delay in receiving performance evalua-
tigons.  At most, these events were hostile only in the sense
that plaintiff herself disliked them or was aggravated by them.
These actions cannot be described as being based on severe and
pervasive discriminatory intimidation or insult.  Count II should
be dismissed.

3. <u>The Complaint Does Not Set Forth A Prima Facie Claim Of
Retaliation.</u>

The elements of the prima facie case where there is a claim
of retaliation differ somewhat from the elements in a discrim-
ination action.  For a prima facie case of retaliation, plaintiff
must establish (1) that she engaged in activity that is statu-
torily protected under Title VII, (2) that the employer took an
adverse action,[2] and (3) that a causal connection existed between
the two.  <u>Mitchell v. Baldrige</u>,759 F.2d 80, 86 (D.C. Cir. 1985).
The causal connection can be assumed, for purposes of establish-
ing the prima facie case, if there is a close temporal connection
between the time of the protected activity and the time of the
adverse action.

---

3. In <u>Burlington Northern & Santa Fe Railway Co. v. White</u>,
___ U.S. ___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006),the Supreme
Court held that a Title VII plaintiff need not allege an adverse
employment action to state a claim for retaliation, but rather must
show that the employer's actions are harmful to the point that they
could well dissuade a reasonable worker from making or supporting
a charge of discrimination." Id. at 2409.; <u>see</u> <u>also</u> <u>Rochon v.
Gonzales</u>, 438 F.3d 1211, 1216 (D.C.Cir.2006).  It is by no means
clear that the allegations made by plaintiff in this case meet the
<u>Burlington Northern</u> standard.

In <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 273 (2001), the Supreme Court addressed this issue, stating that "[the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'...[action taken (as here) 20 months later suggests, by itself, no causality at all." (Citations omitted.) Other cases that have addressed this issue include, e.g., <u>Makers v. Laborers Health & Safety Fund</u>, 478 F.3d 364, 369 (D.C. Cir 2007)(eight or nine month gap too long and citing to <u>Breeden</u> for the proposition that three or four months are insufficient to establish a causal connection); <u>Richmond v. Annex, Inc.</u>, 120 F.3d 205, 209 (10th Cir. 1997) (three months insufficient); <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (four months insufficient); <u>Mitchell v. Baldridge</u>, 759 F. 2d 80, 86 (D.C. Cir. 1985) (adverse action must take place "shortly" after protected activity); <u>Sullivan-Obst v. Powell</u>, 300 F. Supp. 2d 85, 92-93 (D.D.C. 2004) (over three months and fifteen months both insufficient); <u>Devera v. Adams</u>, 874 F. Supp. 17, 21 (D.D.C. 1995) (eight months not strongly suggestive of causal link); <u>Garrett v. Lujan</u>, 799 F. Supp. 198, 202 (D.D.C. 1992) (one year too long); <u>Parrott v. Cheney</u>, 748 F. Supp. 312, 318-319 (D. Md. 1989) (four months too long); <u>Juarez v. Ameritech</u>

13

<u>Mobile Communications, Inc.</u>, 746 F. Supp. 798 (N.D. Ill. 1990)
(almost 6 months insufficient), <u>aff'd per curiam</u>, 957 F. 2d 317
(7th Cir. 1992).

In the instant case, plaintiff's last administrative EEO
complaint – prior to the administrative complaint that led to
this civil action – was filed on November 19, 2002 (approximately
33 months before plaintiff was placed on the PIP) and the final
agency decision finding no discrimination (as to which there was
no further action taken by plaintiff) occurred on July 26, 2005
(approximately six months before plaintiff was placed on the PIP.
The time periods that elapsed between plaintiff's protected
activity and her placement on a PIP are not sufficiently close
temporally so that an inference of a causal connection can be
drawn at the third step of the prima facie case for retaliation.
It follows that plaintiff cannot establish a prima facie case of
retaliation from the temporal relationships.  Count III should be
dismissed.

<u>CONCLUSION</u>

For the reasons set forth above, this case should be
dismissed with prejudice.

                         Respectfully submitted,

                         JEFFREY A. TAYLOR, D.C. Bar #498610
                         United States Attorney

                         RUDOLPH CONTRERAS, D.C. Bar #434122
                         Assistant United States Attorney

14

```
                              /s/
             FRED E. HAYNES, DC Bar #165654
             Assistant United States Attorney
             555 4ᵗʰ Street, N.W.
             Washington, D.C. 20530
             202.514.7201
```

OF COUNSEL:

Kathryn N. Skipper
Attorney Adviser
Department of State
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTISAR R. NA'IM,                )
                                 )
            Plaintiff,           )
                                 )
        v.                       )  C.A. No. 06-2237 (RMU)
                                 )
CONDOLEEZZA RICE,                )
Secretary of State,             )
                                 )
            Defendant.           )
                                 )
_____)

<u>ORDER</u>

Upon consideration of the motion by defendant for summary judgment and the response thereto by plaintiff, it is this _____ day of _____, 2007,

ORDERED that the motion is granted; and it is further

ORDERED that this case is dismissed from the docket of this Court with prejudice.  This is a final, appealable order.

UNITED STATES DISTRICT JUDGE

Copies to counsel for the parties

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTISAR R. NA'IM, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civil Action No. 06-2237 (RMU) |
| | ) |
| CONDOLEEZZA RICE, | ) |
| | ) |
| Secretary of State, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## DECLARATION OF JACQUELINE CANTON

I, Jacqueline Canton, do hereby declare as follows:

1. My name is Jacqueline Canton. I am an employee of the Department of State in the Department's Office of Civil Rights ("S/OCR"). My job title is Chief, Intake and Resolution Section. My grade is GS-14. I am responsible for the daily operation and management of the Department's Equal Employment Opportunity ("EEO") Counseling Program, including developing curriculum, scheduling training worldwide, and maintaining quality assurance of EEO counselors and their work products; the Department's Alternative Dispute Resolution (ADR) program; and the management, development and evaluation of the Department's employment discrimination complaints process.

2. Information in S/OCR on EEO complaints is contained in a database and in paper files. Because of my current position and duties, I have unrestricted access to these files.

3. I have searched S/OCR files for records related to Ms. Intisar R. Na'im. My search included files currently in S/OCR and files that had been stored off-site.

4. Ms. Na'im filed informal complaints of discrimination in 2001 (EEO Case No. I/57-01), and 2002 (EEO Case No. I/05-02). These informal complaints were mediated. Ms. Na'im signed a Mediated Settlement Agreement in connection with the first informal complaint (I/57-01) on September 26, 2001. With respect to the second informal complaint, mediation was not successful, and there is no record that Ms. Na'im subsequently filed a formal complaint of discrimination.

5. S/OCR's files contain a formal complaint of discrimination filed by Ms. Na'im on November 19, 2002 (EEO Case No. 03-09), alleging she was discriminated against based on race (Afro-American), sex (Female), religion (Islam), and reprisal when she was not selected for a GS-13 position on July 31, 2002. Although Ms. Na'im requested a hearing before an EEOC administrative judge (EEOC Case No. 100-2004-00074X), she withdrew that request on April 12, 2005. S/OCR subsequently issued a Final Agency Decision on July 26, 2005, finding no discrimination. S/OCR files indicate that this was the last action with respect to this formal complaint.

6. S/OCR's files contain a formal complaint of discrimination from Ms. Na'im dated on August 15, 2006 (EEO Case No. 092-06), alleging she was discriminated against based on race (African-American) and reprisal when she was placed on a Performance Improvement Plan (PIP) and her 2005 performance rating was delayed. In this formal complaint, Ms. Na'im stated the following as to how she was discriminated against:

> I underwent two EEO/ADR mediations under A-Bureau-IPS management, first with the Director of IPS-Margaret P. Grafeld and a second with supervisor, Tasha Thian. And a pending lawsuit against that office, EEOC case no.100-2004-00074X, Agency No. 03-09. I allege that as a result of that lawsuit and the two EEO/ADR's I continued to experience reprisal from A/IPS management and personnel officials up to the time of my departure from my former office, and that they put me on an illegal Performance Improvement Plan (PIP) to either terminate my job or pressure me out of it. I alleged during both of these mediations that I was not treated fairly in terms of

my PE ratings, did not receive interim progress reports on several occasions, did not always receive my PE rating, was always the last individual to receive a PE ratings review at the end of the review period, despite FAM 2825.6 & .7 regulations. All of my other colleagues were given PE interim progress reports and PE ratings on time. I was not. And, as for the final 2005 PE rating period, I was not given an interim progress report, and I was put in an illegal PIP first by Tasha Thian and Charlene W. Thomas, which continued under Mary Casto. I was not given a copy of my rating for this period before or after I left that office. I was constantly singled out and called into "PIP" meetings for case work situations that were overlooked by IPS managers from (sic) other colleagues. Everything that I did was scrutinized to try to justify the termination of my job, including verbal threats made by both Tasha Thian and Charlene W. Thomas that I would be fired from my job if I did not "improve."

A copy of this formal complaint is attached at Tab 1. Ms. Na'im did not allege a hostile work environment in this formal complaint, and did not even refer to a hostile work environment in this formal complaint. S/OCR dismissed this complaint by letter dated September 28, 2006, because Ms. Na'im did not state actionable claims. A copy of S/OCR's dismissal determination that I signed is at Tab 2.

      7. S/OCR has no record of any other complaints from Ms. Na'im.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Date:  September 20, 2007

Jacqueline Canton

3

TAB 1 TO CANTON DECLARATION

*92*

# FORMAL COMPLAINT OF DISCRIMINATION

Your name:___Intisar Rafiah Na'im_____ U.S.
Citizen: YES × NO ☐
Telephone No: (*Work*)_(202) 955-0580_____(*Home*) _(703)▮
▮_____
Address: 9555 Blake Lane #103, Fairfax, VA  22031-1784_____

Are you working for the Federal government?  YES ×NO ☐
Are you:  Employee ×  Applicant ☐  FSN ☐  Contractor ☐  Other (*Specify*): _____
Title and Grade of Current Position:  _GS-11/Step 10_____
Current Employer:  _U.S. State Dept. Office of Passport Services CA/PPT/WN-SA-17
Address: 1111 19th St., N.W., Washington, D.C. 20522_____
Do you have a representative?          YES ☐  NO ×
If yes, name of representative      _____
Address:  _____

Bureau/Office/Post where you believe the discrimination took place:  A/RPS/IPS/RL/RC-SA-2
Date(s) alleged discrimination occurred: (*month, day, year*)  _____

**Why do you believe you were discriminated against?  (Check all that apply)**
☐ Race (*Specify*)  African American      ☐ Sex  (*Specify*) _____
☐ Color (*Specify*) _____   ☐ Age (*Specify*) _____
☐ National Origin (*Specify*) _____   ☐ Religion (*Specify*) _____
☐ Disability (*circle one*): Mental or Physical (*Specify*) _____
× Reprisal (Identify earlier event and/or opposed practice, give date) 9/26/2001-EEO/ADR
No. I/57-01/ Margaret P. Grafeld & 4/10/2002-EEO/ADR I/05-02 with Tasha Thian.
☐ Sexual Orientation
Have you discussed your complaint with an EEO Counselor?  YES × NO ☐
Did you receive a copy of the EEO Counselor's report?  YES ☐  NO ×
Name of EEO Counselor:  Mr. Dumar G. Stanley_____
Date of final Interview:  June 16, 2006_____
Explain specifically how you were discriminated against (treated differently from other
employees or applicants) because of your race, color, religion, sex, national origin, age,
mental or physical disabilities, reprisal or sexual orientation. (*attach additional sheets, if
needed*):  I underwent two EEO/ADR mediations under A-Bureau-IPS management, first
with the Director of IPS-Margaret P. Grafeld and a second with supervisor, Tasha Thian.
And a pending lawsuit against that office, EEOC case no. 100-2004-00074X, Agency No.
03-09.  I allege that as a result of that lawsuit and the two EEO/ADR's I continued to
experience reprisal from A/IPS management and personnel officials up to the time of my
departure from my former office, and that they put me on an illegal Performance
Improvement Plan (PIP) to either terminate my job or pressure me out of it.  I alleged
during both of these mediations that I was not treated fairly in terms of my PE ratings, did
not receive interim progress reports on several occasions, did not always receive my PE

rating, was always the last individual to receive a PE ratings review at the end of the review period, despite FAM 2825.6 & .7 regulations. All of my other colleagues were given PE interim progress reports and PE ratings on time. I was not. And, as for the final 2005 PE rating period, I was not given an interim progress report, and I was put in an illegal PIP first by Tasha Thian and Charlene W. Thomas, which continued under Mary Casto. I was not given a copy of my rating for this period before or after I left that office. I was constantly singled out and called into "PIP" meetings for case work situations that were overlooked by IPS managers from other colleagues. Everything that I did was scrutinized to try to justify the termination of my job, including verbal threats made by both Tasha Thian and Charlene W. Thomas that I would be fired from my job if I did not "improve."

What remedies and relief are you seeking?   I asked for a "Full Satisfactory" copy of my 2005 PE, something in writing as to the reasons why I was put on the PIP, and a written statement from Central Personnel (HR/EP) indicating their approval/permission granted to A/EX or A/IPS to put me on the PIP as per the requirements of the FAM, along with other remedies in the Allegations & Remedies" statement I submitted to Mr. Stanley.

Have you filed a grievance or appealed to MSPB on the matter(s)? YES ☐  NO ×

_____          __8/15/06_____
**Complaint Signature**                                          **Date**

TAB 2 TO CANTON DECLARATION

**United States Department of State**

*Office of Civil Rights*

*Washington, D.C. 20520–7428*
September 28, 2006

Intisar Rafiah Na'im
9555 Blake Ln. #103
Fairfax, VA 22031-1784

**RE: EEO Case Number: DOS-F-092-06**

Dear Ms. Na'im:

This is to advise that, pursuant to 29 C.F.R. § 1614, *et seq.*, this comprises the Department of State's Final Agency Decision dismissing, in its entirety, your formal complaint of discrimination on the bases of race (African-American) and reprisal (prior protected activity).

Pursuant to 29 C.F.R. § 1614.107(a)(1), an agency shall dismiss an allegation that fails to state a claim under §§ 1614.103 or 1614.106(a). To state a claim under the relevant statutes, a Complainant must allege present harm to a term, condition, or privilege of employment inflicted on the basis of race, color, sex, religion, national origin, age, disability, prior protected activity, or opposition to illegal discriminatory practices.

Based on a review of the EEO counselor's report and your formal complaint, it has been determined that your allegations fail to state a claim pursuant to the above-referenced statutory provisions. You allege the following:

> **Because of your race (African-American) and in reprisal (prior EEO activity), you were discriminated against when:**
>
> **1. You were placed on a Performance Improvement Plan (PIP); and**
>
> **2. Your 2005 performance rating was delayed.**

Equal Employment Opportunity Commission (EEOC) regulation 29 C.F.R. §1614.107(a)(5), provides that an agency shall dismiss a complaint that alleges a

proposal to taking a personnel action, or other preliminary step to taking a personnel action, is discriminatory. The EEOC has held that a PIP which is not placed in the employee's Official Personnel Folder (OPF) is not an adverse employment action. *See* Peppers v. Department of the Army, EEOC Appeal No. 01A51621 (June 8, 2006) *citing* Lopez v. Department of Agriculture, EEOC Appeal No. 01A04897 (Nov. 1, 2000); and Jackson v. Central Intelligence Agency, EEOC Request No. 05931177 (June 23, 1994). You do not assert that the PIP letter has been placed in your OPF, nor does the record indicate as such. The EEOC has repeatedly held that a PIP is merely a preliminary step to taking a personnel action and does not become an official personnel action, sufficient to render you an aggrieved employee. Thus, this allegation fails to state a claim and will not be investigated.

In addition, you allege that management discriminatorily delayed your 2005 performance review. In order to state a claim under the applicable statutes, you must allege present harm to a term, condition, and/or privilege of employment. You merely allege that management delayed your annual performance evaluation. You do not allege that this delay resulted in a reduction of pay or any other harm. As such, the delay of your annual performance evaluation also fails to state a claim. *See* Russell v. Principi, 257 F.3d 815 (D.C. Cir. 2001) (a performance evaluation is not an adverse action unless it is accompanied by reduced performance award).

This constitutes the Department of State's Final Agency Decision. You have the right to appeal this dismissal. Your appeal rights follow:

## APPEAL RIGHTS AND TIME LIMITS (29 C.F.R. §§ 1614.401-403)

If you are dissatisfied with the Department's decision to dismiss your complaint, you may appeal in writing, using the enclosed EEOC Form 573, to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, 1801 L Street, NW, Washington, D.C. 20036, by personal delivery, mail or facsimile (FAX). A copy of EEOC Form 573 must also be furnished to the Principal Deputy, Office of Civil Rights, Department of State, 2201 C Street, NW, Room 7428, Washington, D.C. 20520.

You may file a Notice of Appeal within **30 calendar days** after receipt of this decision. An appeal shall be deemed filed on the date it is postmarked, or in absence of a postmark, on the date it is received by the Commission. In or attached to your appeal to the Commission, you must certify the date and method

by which you provided a copy of the appeal to the Department of State. Any statement or brief in support of the appeal must be submitted to both the Director of the Office of Federal Operations, Equal Employment Opportunity Commission and the Principal Deputy, Office of Civil Rights, Department of State, within **30 calendar days of** filing the Notice of Appeal.

If your appeal is not filed within the 30-day time limit, it will be considered untimely and shall be dismissed by the Commission.

In lieu of the above, you may elect to file a civil action. A complainant who has filed an individual complaint, an agent who has filed a class complaint, or a claimant who has filed a claim for individual relief pursuant to a class complaint, is authorized under Title VII, the ADEA, and the Rehabilitation Act to file a civil action in an appropriate United States District Court:

## RIGHT TO FILE A CIVIL ACTION (29 C.F.R. § 1614.407)

(a) Within **90** days of receipt of the final decision on an individual or class complaint if no appeal has been filed;

(b) After **180** days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued;

(c) Within **90** days after receipt of the Commission's final decision on an appeal; or

(d) After **180** days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

If you choose to file a civil action and you do not have or are unable to obtain the services of a lawyer, you may also request the court to appoint a lawyer to represent you. In such circumstances as the court may deem just, the court may appoint a lawyer for you and may authorize the commencement of the action without the payment of fees, costs or security. Any such request must be made within the above-referenced 90-day time limit and in such form and manner as the court may require.

The filing of a civil action will terminate further administrative processing of the complaint. If you file a private suit subsequent to filing an appeal, you must notify the EEOC in writing. Any suit filed must name the proper defendant. The

-4-

proper defendant for a complaint filed against the Department of State is Condoleezza Rice, Secretary of State.

If you need information or assistance at any stage of the processing of your complaint, please contact Ms. Lannie Prince, the EEO Manager assigned to your case, or myself, at (202) 647-9041.

Sincerely,

Jacqueline A. Canton
Chief
Complaints Management Division

Enclosure: EEOC Form 573, Notice of Appeal/Petition

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTISAR R. NA'IM, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civil Action No. 06-2237 (RMU) |
| | ) |
| CONDOLEEZZA RICE, | ) |
| | ) |
| Secretary of State, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

### DECLARATION OF MELISSA LYTELL

I, Melissa Lytell, do hereby declare as follows:

1. My name is Melissa Lytell. I am the Chief of the Human Resources Division in the Office of the Executive Director of the Bureau of Administration (A/EX/HRD). In this capacity I am responsible for management oversight and policy guidance related to human resources issues, *e.g.* staffing and position classification, employee relations and performance management, for the Bureaus of Administration (A), Oceans and International Environment and Scientific Affairs (OES), Democracy, Human Rights and Labor (DRL), Information Resource Management (IRM), and the Office of the Coordinator for Reconstruction and Stabilization (S/CRS). As such, my office provides human resources support to the Office in which Intisar Na'im was employed, A/ISS/IPS. Additionally, I supervise and manage the

Human Resources Division and represent the organization before higher management and act as a liaison between staff and client organizations.

2. I am familiar with the 60-day Performance Improvement Plan ("PIP") that Intisar Na'im was placed on January 26, 2006. I signed the PIP as the Executive Director's designee.

3. OPM regulations (5 C.F.R. § 432.104) provide the following about addressing unacceptable performance:

> At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical element(s), the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance requirement(s) or standard(s) that must be attained in order to demonstrate acceptable performance in his or her position.

Department of State regulations at 3 Foreign Affairs Manual ("FAM") 2824.5 further provide the following:

**Unacceptable Performance**

a. An employee performing at the Unacceptable level in one or more critical element(s) at any time during the performance appraisal period must be notified of the critical element(s) for which performance is Unacceptable and be afforded an opportunity period to improve. He or she is placed on a Performance Improvement Plan, DS-1765, which consists of 45 calendar days or longer. Notification of Unacceptable performance can occur at any time during the appraisal cycle, including the end of the performance appraisal period.

b. At the conclusion of the opportunity period, if the employee's performance continues to be Unacceptable, action may be initiated to reduce in grade or remove the employee in accordance with 3 FAM 4550 and 5 U.S.C. 4303.

4. The Department of State uses Form DS-1765 and associated Guidelines for Issuing a Performance Improvement Plan. The Guidelines and Form DS-1765 are attached at Tab 1. The Guidelines provide that at any time during the performance appraisal cycle that

an employee's performance is determined to be unacceptable in one or more critical elements, the employee shall receive a Performance Improvement Plan. The determination can be made at the end of the performance rating cycle followed by a formal improvement plan. A PIP only becomes part of the Employee Performance File when an adverse action is taken – a reduction in grade or removal.

5. Ms. Na'im's supervisor, Tasha Thian, determined that Ms. Na'im's performance was unacceptable during the January 1, 2005 to October 15, 2005 period and recommended that Ms. Na'im be placed on a PIP "to allow her an opportunity to bring her performance to a satisfactory level." See Memorandum dated December 22, 2005, attached at Tab 2.

6. Ms. Na'im was placed on the standard PIP used by the Agency (DS-1765) effective January 26, 2006 for a 60-day period until March 26, 2006. By that time, Ms. Na'im had been identified to take a passport specialist position in another bureau, the Bureau of Consular Affairs.

7. The PIP was not placed in Ms. Na'im's Official Personnel Folder and it did not affect Ms. Na'im's grade or salary.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Date:

Melissa Lytell

TAB 1 TO LYTELL DECLARATION

U.S. Department of State

# GUIDELINES FOR ISSUING A
# PERFORMANCE IMPROVEMENT PLAN
*(Civil Service Employee)*

## 1. General

At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical elements, the employee shall receive a Performance Improvement Plan *(PIP)*. This determination can be made at the end of the performance rating cycle followed by a formal improvement plan *(3 FAM 2820)*. Exceptions include: the removal of a probationary employee, and/or a denial of WIGI. During the PIP period, the employee is given a fair and reasonable opportunity to demonstrate acceptable performance commensurate with the duties and responsibilities of the position. Consequently, an opportunity-to-improve should be a reasonable (not necessarily time bound) chance for the employee to demonstrate acceptable performance. The number of days provided in the Performance Improvement Plan is to be determined by the employee's supervisor. This may range from 45 calendar days or longer, depending on the duty(ies) in question, as well as the degree of deficiency in performance and the specific assignment(s) to be considered as part of a realistic opportunity to demonstrate or improve performance to the fully successful level.

## 2. Prerequisites to Formal Improvement Plan

The Performance Improvement Plan must be based on critical job elements and performance standards in effect at the time the PIP is issued. If a previously established performance plan is current at the beginning of the rating period or there is a change of supervisor, the date the plan was discussed with the employee is annotated on the Performance Improvement Plan. Prior to issuance of the plan or an unacceptable performance appraisal report, the rating official should make an effort to determine the cause of the unacceptable performance and should take appropriate action to assist the employee to overcome the deficiency. If appropriate action, including, e.g., formal training, on-the-job training, counseling, or supervisory assistance fails to improve performance sufficiently and it is determined that the employee's performance continues to be unacceptable, the rating official will give the employee a formal written Performance Improvement Plan *(DS-1765)*. The plan may be issued at any time once it has been determined that the employee's performance in one or more critical elements is unacceptable. Preparation of the annual rating may be delayed or extended to allow for the completion of the 45-calendar day or longer, Performance Improvement Plan period.

The rating should then be completed, appropriately reflecting performance during the Performance Improvement Plan period.

## 3. Nature of Performance Improvement Plan

The Performance Improvement Plan requirement allows the employee a reasonable opportunity to demonstrate acceptable performance to avoid a performance-based action. The notice must describe in detail:

a. Those critical job element(s) for which performance is unacceptable.

b. How the employee's performance is unacceptable. *(Cite specific examples as they relate to the critical elements and standards.)*

c. What is the acceptable level(s) the employee must reach, including the acceptable performance of specific assignments specified by the supervisor. What he/she must do to achieve fully acceptable performance.

d. What efforts will be made to assist the employee to overcome deficiencies and meet performance standards, e.g., formal or on-the-job training, counseling, supervisory assistance, etc.

Bureau Personnel lists should have the Performance Improvement Plan reviewed by PER/ER. The rating official should closely monitor the employee's progress, schedule periodic counseling sessions to determine that efforts to improve are underway, provide written constructive criticism and instructions relating to deficiencies, and provide additional assistance, as required.

## 4. Approval or Disapproval

The Bureau Executive Director/Officer must approve or disapprove all Performance Improvement Plans, basing the decision on a review of the plan, other performance-related materials, and/or upon discussion with the supervisor and the employee. The Executive Director/Officer should follow the situation closely until performance has improved or it is determined that it remains unacceptable.

## 5. Employee Statement

The employee must be given a copy of the Performance Improvement Plan and be provided the opportunity to sign the notice to acknowledge receipt and add comments. Signature does not indicate agreement; it is only acknowledgment of receipt of the notice. If employee fails to sign, the supervisor should give a copy of the Performance Improvement Plan to the employee and sign a statement certifying delivery.

## 6. Extending the Performance Improvement Plan

A Performance Improvement Plan may be kept in effect for more than the specified period for compelling reasons, e.g., to allow the employee a reasonable opportunity to demonstrate performance at the fully successful level or higher; when management cannot make a determination about whether the employee's performance has improved to an acceptable level; illness or extended absence of rated employee or supervisor. The employee should be notified in writing of the reason for the extension.

## 7. Termination of the Performance Improvement Plan

A Performance Improvement Plan is not placed in the EPF when:

a. It is not used in preparing a performance-based action - a reduction in grade or removal action;

b. Upon the assignment of a fully successful rating;

c. Upon any change that makes the Performance Improvement Plan inapplicable to the current situation.

If the employee leaves the position during the opportunity period, the Performance Improvement Plan will be destroyed.

A Performance Improvement Plan will become part of the Employee Performance File *(EPF)* only when an adverse action is taken - a reduction in grade or removal.

## 8. Recording the Unacceptable Performance

If the PIP period ends at the same time that the rating cycle ends, i.e., December 31 *(GS and Prevailing Rate Employees)*, the appropriate "Employee Performance Appraisal Report, DS-1966" should be prepared.

However, if the PIP period ends at other than the end of the performance appraisal period, you may complete Part II, Civil Service Employee Performance Improvement Plan *(DS-1765, page 2)*.

This shorter version enables you to address only those critical elements initially identified in the Performance Improvement Plan.

Any summary rating(s) issued earlier in the appraisal year will be considered when arriving at the employee's rating of record.

**9. Proposed Action Based on Unacceptable Performance**

A proposal may be initiated to reduce-in-grade or remove the employee if:

(1) When given the opportunity to demonstrate acceptable performance, the employee fails to demonstrate acceptable performance in the critical element(s) identified in the Performance Improvement Plan notice; or

(2) Once having been given the opportunity to demonstrate acceptable performance and subject to the one year limitation *(5 U.S.C. 4303(c)(2)(A)*, the employee fails to sustain acceptable performance in the critical element(s) identified when the employee was notified of unacceptable performance.

U.S Department of State



# CIVIL SERVICE EMPLOYEES PERFORMANCE IMPROVEMENT PLAN

| PART I - Please read guidelines before completing this form. | |
|---|---|
| Employee Name *(Last, First, MI)* | Social Security Number |
| Position Title | Grade |
| Name of Organization | Period Covered<br>From:          To: |
| Date(s) Job Elements and Standards established: | Date(s) Performance Plan discussed with employee: |

| SECTION I - Continuation sheets may be used; employee statement may be attached. |
|---|

1. The critical element(s) for which your performance is Unacceptable: *(Number each)*

2. Your performance is unacceptable for the following reason(s):

3. Your performance can be improved to the fully successful level by the following action(s) including completion of the following specific assignment(s):

4. The following efforts will be made to assist you:

5. Unless your performance improves to the successful level within _____ calendar days, the Department may propose a reduction in grade or removal in accordance with 5 U.S.C. 432.105 or 3 FAM 4550.

   **NOTE:** If you perform at an acceptable level during the PIP period but resume unacceptable performance within one year following the issuance of the PIP notice, adverse action may be proposed without affording an additional opportunity to improve *(5 CFR 432.105(a)/Section 4302a(b) of Title 5 U.S.C.).*

| Rating Official's Signature | Title | Date *(mm-dd-yyyy)* |
|---|---|---|
| Reviewing Official's Signature | Title | Date *(mm-dd-yyyy)* |

| Executive Director's Signature | Date *(mm-dd-yyyy)* | Title | Date *(mm-dd-yyyy)* |
|---|---|---|---|
| Notice Discussed/Delivered To Employee | Date *(mm-dd-yyyy)* | Employee's Comments Attached<br>☐ Yes   ☐ No | |

| Employee Name *(Last, First, MI)* | Page        of |
|---|---|
| | SSN |

## PART II

### SECTION I - Continuation sheets may be used; employee statement may be attached.

Your performance during the warning notice period is described as follows: *(Give examples)*

☐ Outstanding          ☐ Excellent          ☐ Fully Successful          ☐ Unacceptable

Critical Element Number _____

☐ Outstanding          ☐ Excellent          ☐ Fully Successful          ☐ Unacceptable

Critical Element Number _____

☐ Outstanding          ☐ Excellent          ☐ Fully Successful          ☐ Unacceptable

Critical Element Number _____

### SECTION II - Overall Performance Rating

☐ Outstanding          ☐ Excellent          ☐ Fully Successful          ☐ Unacceptable

### SECTION III

| Rating Official's Signature | Typed Name | Date *(mm-dd-yyyy)* |
|---|---|---|
| Reviewing Official's Signature | Typed Name | Date *(mm-dd-yyyy)* |
| Executive Director's Signature | | Date *(mm-dd-yyyy)* |
| Employee's Signature | | Date *(mm-dd-yyyy)* |

| | Page    of |
|---|---|
| Employee's Name *(Last, First, MI)* | SSN |

Continuation Sheet:  This page may be used as a Continuation Sheet for Part I, Section I, and.or Part II Section I.

U.S Department of State

# CIVIL SERVICE EMPLOYEES PERFORMANCE IMPROVEMENT PLAN

## PART I - PLEASE READ GUIDELINES BEFORE COMPLETING THIS FORM.

**Employee Name** *(Last, First, MI)*

Na'im                    Intisar

**Social Security Number**

**Position Title**

Program Analyst

**Grade**

**Name of Organization**

A/RPS/IPS/RL/RC

GS-12

**Period Covered**
From: 1/26/06    To: 3/26/0~

**Date(s) Job Elements and Standards established:**

3-24-2005

**Date(s) Performance Plan discussed with employee:**

## SECTION I - Continuation sheets may be used; employee statement may be attached.

**1. The critical element(s) for which your performance is Unacceptable: (Number each)**

FOIA/PA ANALYSIS:  Reviews and analyzes requests for information. Processes the full range of incoming requests for DOS records, in accordance with the provisions of the FOIA, the Privacy Act, Department regulations, and Executive Orders.....demonstrates expert knowledge of laws for access to information and laws and guidelines protecting sensitive information.

**2. Your performance is Unacceptable for the following reason(s):**

From January 1 through the present  you have failed to perform  satisfactorily in this critical job element. In a recent review of your cases, you were advised that of the 30 cases you submitted, over 20 contained substantive errors (e.g., citing inappropriate fee provisions, requesting information from a requester which had already been provided, excluding appropriate template language, and not recognizing invalid FOIA requests).  Examples of these cases with edits are attached.

**3. Your performance can be improved to the fully successful level by the following action(s) including completion of the following specific assignment(s):**

Exercise far greater care in reviewing  your FOIA/PA cases by refamiliarizing yourself with the Department's published FOIA regulations, as well as other definitive reference materials available in the Office, and adhering to guidance from recent coaching sessions with your former manager, as well as guidance from your current Branch Chief and Team Leader.

**4. The following efforts will be made to assist you:**

Your Branch Chief and I will continue to hold regularly scheduled coaching sessions to review your work on a case-by-case basis  and advise you  of the errors and the steps you need to take to ensure that  your case work is completed in a more accurate manner.

**5. Unless your performance improves to the successful level within _____ 60 _____ calendar days, the Department may propose a reduction in grade or removal in accordance with 5 U.S.C. 432.105 or 3 FAM 4550.**

NOTE:      If you perform at an acceptable level during the PIP period but resume unacceptable performance within one year following the issuance of the PIP notice, adverse action may be proposed without affording ~~...~~ nal opportunity to improve (5 CFR 432.105(a) Section 4302(b) of Title 5

| | | |
|---|---|---|
| **RATING OFFICIAL'S SIGNATURE** | **TITLE** Chief, Requester Liaison Division | **DATE** *(mm-dd-yyyy)* |
| **REVIEWING OFFICIAL'S SIGNATURE** | **TITLE** Director, Information Programs and Services | **DATE** *(mm-dd-yyyy)* 01-27-2006 |
| **EXECUTIVE DIRECTOR'S SIGNATURE** | **TITLE** Chief, Human Resources Division | **DATE** *(mm-dd-yyyy)* 26-06 |
| **NOTICE DISCUSSED/DELIVERED TO EMPLOYEE:** | **DATE** *(mm-dd-yyyy)* | **EMPLOYEE'S COMMENTS ATTACHED** ☒ YES  ☐ NO |

DS-1765
10-2004

Page 1 of 3

\* Employee refused to sign 1/26/06 and employee wishes to submit comments. I.B.

**PART II**

## SECTION I - Continuation sheets may be used; employee statement may be attached.

Your performance during the warning notice period is described as follows: *(Give examples)*

Critical Element No. 1 _____

☐ OUTSTANDING   ☐ EXCELLENT   ☐ FULLY SUCCESSFUL   ☐ UNACCEPTABLE

Critical Element No. 2 _____

☐ OUTSTANDING   ☐ EXCELLENT   ☐ FULLY SUCCESSFUL   ☐ UNACCEPTABLE

Critical Element No. 3 _____

☐ OUTSTANDING   ☐ EXCELLENT   ☐ FULLY SUCCESSFUL   ☐ UNACCEPTABLE

## SECTION II - OVERALL PERFORMANCE RATING

☐ OUTSTANDING   ☐ EXCELLENT   ☐ FULLY SUCCESSFUL   ☐ UNACCEPTABLE

### SECTION III

| | | |
|---|---|---|
| Rating Official's Signature | Typed Name<br>Charlene Wright Thomas | Date *(mm-dd-yyyy)* |
| Reviewing Official's Signature | Typed Name<br>Margaret P. Grafeld | Date *(mm-dd-yyyy)* |
| Executive Director's Signature | | Date *(mm-dd-yyyy)* |
| Employee's Signature | | Date *(mm-dd-yyyy)* |

DS-1765

Employee's Name (Last, First, MI)

Na'im , Intisar

SSN

CONTINUATION SHEET: This page may be used as a Continuation Sheet for Part I, Section I, and.or Part II Section I.
Crtical Element #2:

CASE MANAGEMENT

Manages assigned caseload and is time sensitive to answering requests within the statutory requirements. Maintains administrative record that accurately and completely reflects Department of State action taken. Case files are organized in standard format; documents official Department determinations on all preliminary issues to be resolved, including identification of pertinent access provisions....all information in the case file is promptly entered into FREEDOMS. When assigned, handles an average of 12 initial processing cases weekly with less than a 1% error rate.

Your performance is unacceptable for the following reasons:

You have consistently failed to do the following in a timely manner: conduct initial analyses of incoming Freedom of Information and Privacy Act cases; confirm their validity; acknowledge receipt of requests by way of a letter to our requesters; and update the FREEDOMS system within the established standard of 12 cases per week (or one case every 3.33 hours). Please see Tab A Memorandum of Counseling in which your performance is discussed in more detail.

Your performance can be improved to the fully successful level by the following actions:

You need to reach the established production standard by working more diligently to conduct the necessary research on your cases in order to resolve any issues in an efficient and effective manner and pay closer attention to detail in ensuring that your cases are handled in a first-in, first-out manner. You also need to improve your organizational skills in maintaining case work in an organized and readily accessible manner. You have been directed to sign up and attend classes (e.g., managing multiple priorities) to improve your organizational skills. Also, you were afforded an opportunity to attend a two-day FOIA/PA training class to improve your understanding of the FOIA/PA laws and regulations. You should refamiliarize yourself with the guidance provided at the training conference.

The following efforts will be made to assist you:

We will continue the regularly scheduled coaching meetings to help you better understand the FOIA/PA laws and regulations.

DS-1765

Performance Improvement Plan
Na'im, Intisar

Critical Element 3:

## CUSTOMER SERVICE

Communicates orally and in writing with requesters. Communications are timely, informative, customer-friendly and fully documented. Acknowledgement letters to simple/routine requests and validity letters are responded to in three working days while more difficult/complex requests are responded to in five working days. Letters are in proper format and typographical errors are less then 1%.

Performance is Unacceptable:

With only a few exceptions, you fail to respond to requesters in the three to five day response time as stated in this element. For example, on several occasions you did not act upon incoming requests from a requesters in response to her acknowledgement letters. Moreover, you did not report having a backlog of the validity cases. In a meeting in September 2005, you were asked about case number 200404283 where it appeared that the customer's response was lost; after being reported as having been received several months earlier by another employee. In fact, you subsequently stated to us that this material had been "inter filed within ... other materials." Moreover, of the 30 2nd acknowledgement/validity cases you handled, the vast majority were not processed in a timely manner and most were many months old. (See examples)

Your performance can be improved to the fully successful level by the following actions:

Be cognizant of your workload, processing requests on a first-in, first-out manner. You should also better organize your work area so that you do not misplace cases and maintain your files in good order so that you can quickly discern which cases require your follow up or further attention.

The following actions will be made to assist you:

Your Branch Chief and I will continue to hold regularly scheduled coaching sessions to review your work on a case-by-case basis and advise you of any

errors and the steps you need to take to ensure that your case work is completed in a more accurate and timely manner.

TAB 2 TO LYTELL DECLARATION



**United States Department of State**

*Washington, D.C. 20520*

December 22, 2005

## MEMORANDUM

TO:    A/RPS/IPS – Ms. Margaret P. Grafeld
       A/RPS/IPS/RL – Ms. Charlene Wright Thomas

FROM:    A/RPS/IPS/PP-BR – Tasha M. Thian

SUBJECT:  Na'im, Intisar 2005 Performance

I am submitting this memorandum as an official summary and assessment of the performance of Intisar Na'im, GS-12, Program Analyst assigned to the Requester Communications Branch from January 1, 2005 through October 15, 2005 as her rating official for that time period.

A review of the various performance documentation which includes FREEDOMS reports, weekly reports from Ms. Na'im, review of case files, and the numerous counseling sessions held during 2005 leads me to conclude that Ms. Na'im's overall 2005 performance was unacceptable. Specifically, Ms. Na'im failed to meet the standards for Critical Element 1 – FOIA/PA Analysis; Critical Element 2 - Case Management; and Critical Element 3 - Customer Service. She failed to process an average of 12 cases weekly (or one case per every 3.33 hours), or provide timely communications to our customers. Moreover, due to her difficulty in handling her case load, more difficult cases or time sensitive requests were not assigned to her, but were assigned to more junior officers.

Both the Division Chief and I conducted several performance counseling sessions with Ms. Na'im (March 24, August 10, August 25, September 2, September 16, September 23, and October 14). At these counseling sessions, Ms. Na'im was presented with statistics on her performance. On September 2, 2005, we issued a formal Memorandum of Counseling of our August 25, 2005 session with Ms. Na'im (see Tab A), advising that her performance under Critical Element 2 was unacceptable.

Below I will discuss the three critical elements and Ms. Na'im's failure to meet the standards.

## FOIA/PA ANALYSIS

This element requires Ms. Naim to review and analyze requests for information. Most importantly is that she demonstrates expert knowledge of statutory and procedural requirements for access to information and applies that body of knowledge in drafting acknowledgement and validity responses.

Whether from a lack of knowledge on how to handle a request or a failure on her part to ask questions or to take appropriate action, Ms. Na'im on numerous occasions failed to act upon incoming responses from our requesters in response to her acknowledgement letters. Most disturbingly was that Ms. Na'im did not report having a backlog of the validity cases.

Further, Ms. Na'im did not maintain her cases in an organized or accessible manner. In a meeting in September 2005 (after stating on numerous occasions that for certain periods in the calendar year that she was not given work to do), Ms. Na'im was asked about case number 200404283 where it appeared that the customer response was lost after being reported as having been received several months earlier by another employee. In fact, Ms. Na'im had the material which was received on December 3, 2004. She then stated to us that she had several validity cases that were "inter-filed with her other materials." Thus, Ms. Na'im misstated her caseload and had submitted false weekly reports that indicated that she had no backlog of validity cases. I verbally pointed out her weekly reporting errors on several occasions. I also sent her an email on May 18 that her weekly report of 5/9 – 5/13 was inaccurate, as well as an email dated August 22 that two of her August weekly reports were in error.

Of the 30 2nd acknowledgement/validity cases handled by Ms. Na'im during this rating period, the vast majority were not processed in a timely manner and most were many months old. This was also at a time when Ms. Na'im stated she was not given enough work to do as an excuse for not meeting the productivity levels in Critical Element 2. I am attaching at Tab B case comments from a sample of the validity cases where the Program Assistant recorded as having received the materials and Ms. Na'im's eventual response to the requester which was several months later. The delay caused hardships to the customers and made the Department vulnerable to litigation for failure to meet the statutory requirements of the FOIA.

2

In addition, Ms. Na'im made careless errors regarding fee issues and proper transfer of cases. For example, on two requests for USAID records Ms. Na'im submitted draft letters where she failed to use the transfer language template. She insisted that USAID was part of the State Department until I showed her the USAID FOIA contact.

## CASE MANAGEMENT

This element requires Ms. Na'im to manage her assigned caseload, adhering to the statutory requirements and the RC requirement of processing routine cases within a three-day time period. She is also to maintain an accurate and complete administrative record of the action taken in an organized manner. The element requires Ms. Na'im to handle an average of 12 initial processing cases weekly with less than a 1% error rate.

The initial processing cases include both initial acknowledgement letters as well as follow up (validity) letters on invalid cases. Specifically, Ms. Na'im failed to conduct initial analysis of incoming Freedom of Information Act and Privacy Act cases, determine their validity, acknowledge receipt of requests by way of a letter to our requesters, and update the FREEDOMS system within the established standard of 12 cases per week (or one case every 3.33 hours). Please see attached Memorandum of Counseling which discussed her performance in more detail. Ms. Na'im was given FREEDOMS reports that indicate which cases she acknowledged during that time frame. Even after this counseling session Ms. Na'im failed to consistently bring up her production level. For example, for the weekly period August 29 – September 2 she processed one case every 4.4 hours. And, again during the week of September 12 – 16 she averaged one case every 4.375 hours.

In our performance meetings, Ms. Na'im has consistently stated that for the first part of the year she was not assigned enough cases. Attached at Tab C please find a print-out from AAS of cases that were over 15 days old and had not been acknowledged. Ms. Na'im consistently had cases on the list. This clearly shows that she had work to do. Her assertions that she was not assigned work is in fact inaccurate. Moreover, Ms. Na'im's work had to be reassigned. For example, on February 18 Ms. Na'im left the following note to her team leader "Rene here's 11 of the 12 cases back you gave me this week. Due to working on my backlog of validity cases and being on leave this week, I fell behind. I will be back in the office next Wednesday should you want me to process them. I didn't want them to sit on my desk while I'm away. Thanks, Intisar."

Ms. Na'im frequently did not submit weekly reports and was asked numerous times for them.

## CUSTOMER SERVICE

This element requires Ms. Na'im to timely communicate with various customers and resolve pertinent issues in her cases. It also requires that the written submission be technically correct and in proper format.

With only a few exceptions, Ms. Na'im consistently failed to respond to requesters in the three day response time (or the five day response time for more complex cases). In addition to the 2nd acknowledgment/validity cases as discussed in Critical Element 1 above (see Tab B), I have analyzed the cases assigned to her this year for timeliness. Please find at Tab D a list of her assigned cases with the date assigned penciled in. This data was derived from my notes on cases assigned and Rene Lindsey's reports for the first part of the year. A comparison of the acknowledgement letter date with the date assigned will clearly show that Ms. Na'im consistently failed to handle her cases within the prescribed time frame.

Based upon the foregoing I conclude that Ms. Na'im overall performance was unacceptable during the period January 1, 2005 through October 15, 2005. I recommend that Ms. Na'im be placed on a Performance Improvement Plan to allow her an opportunity to bring her performance to a satisfactory level.

If you have any questions please let me know.

Attachments
        As Stated.

Cc: Mary Casto

4

# TAB A

September 2, 2005

Memorandum of Counseling
of August 25, 2005

On August 25, 2005, a meeting was held to discuss your performance with respect to the Case Management Element (Job Element 2) of your performance standard (a copy of which is attached). In addition to myself, Tasha Thian, Chief, Requester Communications Branch, and Lisa Bell, Human Resources Specialist, were in attendance.

During this discussion, I advised you that your productivity levels from January 2005 to the present were unacceptable. Using data obtained from FREEDOMS, you were advised that your completed cases were as follows:

|        | | Initial Ack Letters | 2nd Ack Letters |
|--------|---|------|---|
| Jan    | - | 7    | 0 |
| Feb    | - | 9    | 5 |
| March  | - | 14   | 1 |
| April  | - | 25   | 0 |
| May    | - | 36   | 1 |
| June   | - | 3    | 9 |
| July   | - | 23   | 1 |

Twice during this rating period, once on March 24, and again on August 10, you were reminded of the performance standard which requires you to complete 12 cases each week in order to be at the satisfactory level, and were advised that your productivity was consistently below the standard.

Although you explained that you had taken leave during various parts of the year, your leave does not excuse or explain the low productivity. An example would be that during the month of July, which you were out of the Office for 29.25 hours (or about 3 days): out of a total of 16 workdays or 160 hours, your productivity was 5.45 hours per case (130.75 available hours divided by 24 cases equals 5.45). An acceptable productivity level for that time period would have been 39 cases (one case completed every 3.33 hours (40-hour workweek divided by the 12 cases standard per week)). As such, the number of cases processed, excluding leave taken, should have been 39. However, your production for that time period was 24, which is considerably lower than the standard, notwithstanding your time off.

Moreover, your unacceptable performance continued into August, despite two performance coaching sessions, where you completed 27 cases for the weeks of

August 1 – August 26. Your productivity average is 4.8 hours per case (15* workdays with 20.50 hours of leave taken (150 hours minus 20.50 equals 129.50 available hours divided by the 27 cases)).

We further advised you of the need to ensure accurate reporting of your cases, maintain better organization of your case files, and employ better judgment in your case prioritization. For example, your August 8 – 12 report stated you completed and mailed 15 acknowledgment letters. However, a search of the FREEDOMS database indicated only 7 cases completed during that time period.

During the meeting you advised that the reports provided by Ms. Thian were inaccurate and provided me with copies of completed cases. In reviewing the material you submitted in an effort to support your claim, I noted that many were duplicates and the data was unorganized, even though I allowed you a full day to retrieve and/or produce any data to support your assertion that you completed 15 cases during the time period in question. I strongly encourage you to take greater care in the maintenance of your cases. This will not only help us to identify any discrepancies, but also provide you with the necessary information to produce accurate reports.

To assist you, effective immediately, your Branch Chief will provide you with a weekly print-out from FREEDOMS. Using this data, you are to reconcile the report each week against your data. You will immediately bring any inconsistencies to the attention of your Branch Chief and myself for reconciliation. If the reports do not match your production, please provide a copy of *only* those cases excluded from the report that have been cleared and mailed (either in paper or electronically) to the requester directly to me for further review.

During that meeting, we reiterated the need for you to employ sound judgment in managing your tasks to ensure that your cases are processed on a first-in/first-out basis, making certain that all required edits are quickly and accurately incorporated into the final product in order to complete the case as soon as possible.

Lastly, I informed you that we are considering revising your current schedule of a 10-hour workday to a 9-hour workday to allow you additional time in the Office to increase your productivity and to receive coaching and assistance from the Branch Chief. I am awaiting guidance from Ms. Bell on how to proceed in this direction. Further, I understand that Ms. Bell has provided you with additional information to facilitate the decision of the Office of Medical Services regarding your request to stay on a 10-hour four-day week as a reasonable accommodation.

Please be advised that our goal is to enhance your productivity not only to help you achieve a satisfactory performance level, but also to meet the overall performance goals of IPS. Your Branch Chief will remain accessible to assist you with any questions you

may have to facilitate the processing of your assigned cases to help you meet the productivity standard.

I am confident of your ability and willingness to meet the productivity standard on a consistent basis. However, failure to do so on your part will necessitate our placing you on a performance improvement plan. Your Branch Chief has been asked to closely monitor your work over the next four weeks (through September 29). During this time, we will have coaching meetings to ensure that your have the necessary resources to complete the processing of your cases in a timely and effective manner. The next scheduled meeting is Friday, September 16, at 10am, and every Friday thereafter through September 29th.

Please contact me directly if you have any questions.


Charlene Wright Thomas
Chief, Requester Liaison Division


Tasha Thian
Chief, Requester Communications Branch


*You were provided with a full workday to obtain the necessary documentation to support the case reporting for your weekly submission. I have deducted that day from your "available" workdays to accurately and fairly reflect your productivity.

Received by: _____
Intisar Naim
September 2, 2005

February 9, 2006

Response to Memorandum of Counseling/Impending Performance
Improvement Plan (PIP)
Of August 28, 2005 and Issues related to the Production of my Case work,
Work performance, and Distribution/Receipt of cases for processing, etc.

In response to the August 25, 2005 meeting with Charlene W. Thomas and
Tasha Thian, with A-Bureau Human Resources Personnel Specialist Lisa
Bell in attendance, herein are the weekly work reports as verified by the
"FREEDOMS" data sheets provided by Tasha Thian, and my further
analysis and tally, for the periods between January 1, 2005 through July,
2005, and related information corresponding to the Memorandum of
Counseling.

And, as per the discussion with Charlene W. Thomas and Mary T. Casto in
the Friday, January 13, 2006, at approximately 11:15a.m., included are the
weekly work reports for August 1 through October 31, 2005.

In that meeting, Charlene informed me that I will be placed on a
Performance Improvement Plan (PIP) due to the fact that I did not make my
production/quota of 12 or more cases weekly as per our Job Element 2
which states "When assigned, (the analyst) handles an average of 12 initial
processing cases weekly…" She said that I will be placed on the PIP for
case processing under Tasha Thian from January 1, 2005 through October
31, 2005.

I maintained and I reiterate that I have not always received this 12 case total
in a manner by which I could produce/make my 12-case quota on a weekly
basis.

The following table illustrates the total of cases I received for each month during the PE year 2005 on a bi-weekly basis including the period of assignment, number of cases assigned monthly, and in instances where I had validity letters, numbers of these as well. Copies of the weeklies which also include the day of the week that I received the majority of my cases, and number of cases in Q.C., are also enclosed for your reference:

| Month | Dates Assigned | 1st ACK Ltr | 2nd ACK Ltr | Cases assigned. |
|---|---|---|---|---|
| January, 2005 | 1/3/05-1/31/05 | 9 | 0 | 1 case assigned |
| February, 2005 | 2/4/05-2/28/05 | 9 | 0 | 22 cases assigned for the month |
| March, 2005 | 3/7/05-3/28/05 | 14 | 01 | 16 cases assigned for the month |
| April, 2005 | 4/4/05-4/29/05 | 25 | 0 | 2 cases assigned for the month |
| May, 2005 | 5/2/05-5/31/05 | 39 | 1 | 25 cases assigned for the month |
| June, 2005 | 6/1/05-6/30/05 | 3 | 9 | 29 cases assigned for the month |
| July, 2005 | 7/4/05-7/29/05 | 20 | 1 | 22 cases assigned for the month |
| August, 2005 | 8/1/05-8/31/05 | 28 | 0 | 22 cases assigned for the month |
| September, 2005 | 9/1/05-9/30/05 | 22 | 6 | 43 cases assigned for the month |
| October, 2005 | 10/3/05-10/31/05 | 17 | 11 | 0 cases assigned for the month |

- Reference is made to the calculation of my case productivity for the month of July. As it was estimated by Charlene and Tasha that I should have produced at least 39 cases in 3.33 hours. Please be advised as per the above table, I received only 22 cases for the month of July, and I processed approximately 20 of these as indicated in "Freedoms." I processed the cases that I received. When I was given back cases for revisions and instructed to change the clearance date, these cases added to the total of cases I processed/sent out for the given month.

- As for the calculation cited for the hourly processing of a FOIA/PA case, it is herein noted that this is the first time that I was made aware of this formula. Neither of you certainly brought forth such estimation in the meetings in March and August. Nor have you discussed this requirement out in the open in office meetings so that everyone is made aware of these expectations. Furthermore, given that every FOIA and PA case is different, it is difficult to put a blanketed time frame on them i.e. one FOIA case may be routine with a simplistic straight forward process requirement, whereas, another could require extensive time to do research, contact other FOIA liaisons, etc. in order to process/complete the case. IPS managers as well as analysts are well aware of this situation. I would like to assume that the same hourly production standard is being applied to the process of clearing the cases that the analyst puts into Q.C.

- Again, my calculation indicated that I processed 28 cases for the month of August, although 22 cases were assigned to me for the whole month. This indicates that I have been working with a back log of only 8 cases, as during some weeks of the month, as my weekly for 8/8/05-8/12/05 and 8/15/05-8/19/05 indicated that I received no new cases for these two weeks respectively. Yet, I continued to produce case work from the cases that I did receive. For instance, I put 17 cases into clearance (Q.C.) during the week of 8/1/05-8/5/05, and they remained there uncleared for a period of time before Tasha returned them to me. Moreover, this illustrated that I was producing cases, and putting the work into Q.C. Nevertheless, because the cases hadn't gone out to requesters, I am to assume that the blame for the non-productivity falls back upon me. If I am not mistake, in the 9/2/05 meeting Charlene said that I am responsible for getting 12 cases into the mail on a weekly basis/meeting my 12 cases a week quota.

- Once the analyst put the work into Q.C., s/he has no further control on when the work goes out or on the productivity level of the case processing. Therefore, I respectfully disagree with the assessment by IPS management that my productivity/performance continued at an unsatisfactory/unacceptable level.

- As for the accurate reporting of my cases, maintaining of better organized case files, and employing better judgment in case prioritization, I again, respectfully disagree.

- I explained to Charlene and Tasha that I prioritized the processing of the newer FOIA/PA cases she gave me during the month of August, and put aside the returning cases in order to increase my case productivity. I added that I did not want to fall behind in production while continually revising again and again cases that I'd given her weeks earlier. In some instances she'd given me cases back weeks later that had had minor corrections. I was required to stop processing the newer cases, correct/revise these cases, some of which had minor errors that she'd passed off as acceptable in other FOIA/PA cases I'd given her in the past, while the newer cases remained unprocessed. Thereby inadvertently increasing my backlog of unprocessed cases.

- As for the organization of my case files, and the 15 acknowledgment letter/cases in question that I sent to the requesters during the 8/8/05-8/12/05, the package I presented in the 9/2/05 meeting were not duplicates, but attached copies of the acknowledgment letter in various stages of revision/updating. I attach the returning "file copy" with the supervisor's commentary onto my copies of the original acknowledgment letter, and once it clears, I make a copy of the "file copy" clear, final original acknowledgment letter going to the requester, a copy of his/her original inquiry letter, and all related attachments, and put the "Freedoms" report-7, Identity field report, and commentary on top of it in that order. This is what I presented to Charlene and Mary in the meeting.

- In reference to Tasha's August 23, 2005 e-mail, (a copy is enclosed for your reference) in which it was insinuated that I "double counted" the acknowledgment letters sent to requesters for the weekly work report of 8/8/05-8/12/05, enclosed for your reference is the post-it-note indicating that I sent out the following acknowledgment letters to requesters with the Q.C. dates in parenthesis on 8/11/05: 200503058 (7/15/05) 200502932. 200502931. 200502934. 200502933 (8/4/05) 200502692, 200502753, 200502694 (7/11/05) 200503033, 200503064, 200503069, 200502866, 2005002861(7/29/05) & 200502930, 200502937 (8/11/05).

- Because I received a large number of cleared cases from Q.C. all at one time, including cases from two different months, July and August, I physically sent out 15 cases for this work period. It has been my experience that cases haven't always come back to me during the actual weekly work reporting period that I put them into Q.C. Therefore, I haven't always made my quota for a particular work week. And, in some instances, when the case has come back, I had to change the send out date, although I may have written the letter up to a week or more before and put it into Q.C.

- 

- To further illustrate my point, I also enclose a copy of the "file copy" for FOIA case no. 200501183, ███████████, Esq. for client, ████████████████ I put this case into Q.C. on 4/7/05, Tasha had another analyst clear it on 4/8/05, then she cleared it again on 4/18/05 I received it back on 4/18/05, ten days later and sent it out on that date.

- As for my productivity, "Freedoms" indicates that as of 1/25/06, I processed a total of 231 cases from 1/1/05-12/31/05. I have both e-mails and verbal praise from IPS management indicating that I am making my production quota. And, I am getting the cases I need to do so. Some of those e-mails are enclosed.

Enclosures:

"Freedoms" Adhoc case list retrieved 1/25/06
Weekly Work Reports for 1/1/05-10/31/05
E-mails and memorandums to IPS managers requesting case work

| Case | Requester Name | IP Officer | Rec'd | Ack Ltr ( ) | Section |
|------|---------------|------------|-------|-------------|---------|
| 00502897 | ████████ | NAIMIR | 06-30-2005 | 08-23-2005 | RC |
| 00502908 | ████████ | NAIMIR | 06-30-2005 | 08-19-2005 | WEB |
| 00502915 | ████████ | NAIMIR | 06-30-2005 | 08-15-2005 | RC |
| 00502930 | ████████ | NAIMIR | 07-06-2005 | 08-11-2005 | RC |
| 00502931 | ████████ | NAIMIR | 07-06-2005 | 08-04-2005 | EAN |
| 00502932 | ████████ | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502933 | ████████ | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502934 | ████████ | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502937 | ████████ | NAIMIR | 07-06-2005 | 08-11-2005 | |
| 00503000 | ████████ | NAIMIR | 07-11-2005 | 08-26-2005 | RC |
| 00503027 | ████████ | NAIMIR | 07-14-2005 | 08-15-2005 | RC |
| 00503033 | ████████ | NAIMIR | 07-12-2005 | 08-08-2005 | RC |
| 00503058 | ████████ | NAIMIR | 07-15-2005 | 08-08-2005 | MPD |
| 00503060 | ████████ | NAIMIR | 07-15-2005 | 08-19-2005 | RC |
| 00503064 | ████████ | NAIMIR | 07-13-2005 | 08-08-2005 | RC |

Can totals attached to Tasha's 12/30/05 memo received by me in the "PIP" session of 3/9/06 - Please note the change in my 2005 case totals from

1/23/06 at 231 } "freedoms
2/8/06 as 162 } reports enclosed in the EEO 3/9/06 package.