**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTISAR R. NA'IM ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06 CV 2237 (RMU) |
| ) | |
| CONDOLEEZA RICE ) | |
| ) | |
|     Defendant. ) | |
| _____) | |

**PLAINTIFF'S OPPOSITION TO THE GOVERNMENT'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff, Intisar Na'im, by and through her undersigned counsel, and hereby respectfully submits this opposition to the Government's Motion for Summary Judgment.

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Local Rule 7(h), plaintiff respectfully submits the following statement of material facts for which there exists a genuine dispute.

1.       Plaintiff admits the facts contained in paragraph 1 of the Government's Statement of Material Facts.

2.       Plaintiff admits the facts contained in paragraph 2 of the Government's Statement of Material Facts. Plaintiff, however, is without sufficient knowledge to admit the Government's characterization of plaintiff's assignment as a "new position," and therefore denies that portion of the Government's statement.

3.       Plaintiff admits the facts contained in paragraph 3 of the Government's Statement of Material Facts.

4.       Plaintiff admits the facts contained in paragraph 4 of the Government's Statement

of Material Facts to the extent that plaintiff filed an informal complaint of discrimination in 2001.  Plaintiff *denies* that is was her first complaint of discrimination filed against the Government.

5.      Plaintiff admits the facts contained in paragraph 5 of the Government's Statement of Material Facts.

6.      Plaintiff admits the facts contained in paragraph 6 of the Government's Statement of Material Facts.

7.      Plaintiff admits the facts contained in paragraph 7 of the Government's Statement of Material Facts.

8.      Plaintiff admits the facts contained in paragraph 8 of the Government's Statement of Material Facts to the extent that plaintiff's August 15, 2006, complaint of discrimination alleged discrimination on the basis of race and "reprisal."  Plaintiff denies that her complaint was limited to disparate treatment or retaliation claims (Formal Charge of Discrimination, incorporated herein as Plaintiff's Exhibit "A").

9.      Plaintiff admits the facts contained in paragraph 9 of the Government's Statement of Material Facts to the extent that the Government's cited reference accurately quotes a portion of plaintiff's 2006 complaint of discrimination.

10.     Plaintiff admits the facts contained in paragraph 10 of the Government's statement of Material Facts to the extent that her complaint was dismissed on September 28, 2006.  Plaintiff *denies* that her complaint failed to state actionable claims.

11.     Plaintiff admits the facts contained in paragraph 11 of the Government's Statement of Material Facts.

12.     Plaintiff admits the facts contained in paragraph 12 of the Government's

Statement of Material Facts.

13.    Plaintiff admits the facts contained in paragraph 13 of the Government's Statement of Material Facts.

14.    Plaintiff admits the facts contained in paragraph 14 of the Government's Statement of Material Facts.

15.    Plaintiff admits the facts contained in paragraph 15 of the Government's Statement of Material Facts.

16.    Plaintiff admits the facts contained in paragraph 16 of the Government's Statement of Material Facts to the extent that the Government to the extent that Ms. Na'im was through duress forced to take a demotion as a passport specialist. (Complaint ¶12).

17.    Plaintiff admits the facts contained in paragraph 17 of the Government's Statement of Material Facts to the extent the Government's statement accurately quotes relevant Civil Service guidelines.

18.    Without proper discovery, plaintiff is without sufficient knowledge admit or deny the facts contained in paragraph 18 of the Government's Statement of Material Facts, and therefore *denies* the facts contained therein.

19.    Since about 1991, Ms. Na'im had been employed with the United States Department of State, and in about 1997, Ms. Na'im was assigned to work in the State Department's Office of Information Resources and Management Programs and Services, Requester Liaison Division ("IPS") as a Program Analyst. (Complaint ¶6).

20.    By 1999, Ms. Na'im had been an Information Analyst in that office for about three (3) years, and had risen to the grade level of GS 12 step 5.  Her duties in that position included organizing and coordinating the information access under the Freedom of Information

Act (FOIA) and Privacy Act (PA) programs, among other duties. (Complaint ¶6).

21.    On or about September 26, 2001, Ms. Na'im filed an informal EEO Complaint alleging race discrimination against her department chief Margaret Grafeld. (EEO No. 01-57). By that complaint, Ms. Na'im alleged that Grafeld had created an impermissibly hostile environment when she subjected Ms. Na'im to racially derogatory comments during the course of Ms. Na'im's security clearance investigation and an internal evaluation of Ms. Na'im's ultimately unsuccessful candidacy for a 1999 promotion within the department.  Ms. Na'im also alleged that defendant had failed to provide her with timely performance evaluations, gave her unwarranted low performance ratings, and portrayed her in a demeaning and highly negative light professionally which undermined her work performance and professional standing. (Complaint ¶7).

22.    Following the filing of Ms. Na'im's 2001 EEO complaint, and the subsequent resolution of that claim, the pattern of discrimination and harassment against Ms. Na'im continued. (Complaint ¶7).

23.    On or about May 10, 2002, Ms. Na'im filed an informal EEO complaint against her immediate supervisor Tasha Thian. (EEO No. 02-05).  By that complaint, Ms. Na'im claimed that the discriminatory conduct alleged under the prior EEO complaint continued under the subsequent supervision of Thian. Specifically, Ms. Na'im proffered that Thian had unfairly, and without cause or justification, provided her with untimely and unwarranted downgrading of her performance ratings in 2001 and attempted to place her on an utterly unjustified Performance Improvement Plan. (Complaint ¶8).

24.    In May 2002, Ms. Na'im's department issued a vacancy announcement for a GS 13 position (Vacancy Announcement No. 02-060).  On May 15, 2002, Ms. Na'im applied for the

position in the vacancy announcement.  Ms. Na'im was informed that she was qualified and her name was certified with other qualified candidates.  Once again, Ms. Na'im was not hired for the position.   As a result of her non-selection, Ms. Na'im filed an informal complaint of discrimination in January 2003. (EEO No. 03-09). (Complaint ¶9-10).

25.    Since the filing of the above EEO protected activities, Ms. Na'im has been the victim of continued and unjustified demeaning comments about her professional abilities, her personal character and personal appearance by her supervisors and other agents of defendant.  By 2005, Ms. Na'im was placed on an unjustified "Performance Improvement Plan," forced to endure harassing "coaching sessions" and threats of termination despite the fact that Ms. Na'im consistently either met her or exceeded her production "quotas." (Complaint ¶11).

26.    During the course of her PIP sessions, Ms. Na'im was concerned that her rights were being violated and requested union representation at PIP meetings. (Email dated January 19, 2006, incorporated herein as Plaintiff's Exhibit "B").

27.    Ms. Na'im complained to her supervisors that the PIP had not been adequately supported by a 2005 Performance Rating or interim progress report. (Email dated March 9, 2006, incorporated herein as Plaintiff's Exhibit "C").

28.    Ms. Na'im further complained that "Tasha [Thian] never came to me to discuss anything about my performance throughout the 2005 rating period, nor did she go over a 6-mmonth progress interview with me, only calling into meetings with your (sic) and herself, and A-bureau personnel, one of which she made remarks about my job being terminated." (Email dated January 13, 2006, incorporated herein as Plaintiff's Exhibit "D").

29.    On or about February 28, 2006, Ms. Na'im filed an informal charge of discrimination against her supervisors. (Email dated February 28, 2006, incorporated herein as

Plaintiff's Exhibit "E").

30.     Pursuant to her EEO counselor's request (Email dated March 9, 2006, incorporated herein as Plaintiff's Exhibit "F"), Ms. Na'im submitted a written summary proffering, among other things, that "I am alleging that this mistreatment, humiliation, and discrimination is racially motivated, and it is a direct result of a personal vendetta that IPS Director, Margaret P. Grafeld has against me, as evidence by the comments she made about me to the DS investigator during my 2001 security clearance investigation. She does not respect me as a person, or my professionalism." (Allegations and Remedies, incorporated herein as Plaintiff's Exhibit "G" at 1). Ms. Na'im further alleged that Ms. Grafeld influenced colleagues attitudes about Ms. Na'im's character and personality to such a degree that those colleagues reported that they felt "physically threatened" by Ms. Na'im. (Ex. G at 2). Ms. Na'im also recounted an incident in which Ms. Grafeld commented on Ms. Na'im's "kinky" hair. (Ex. G at 3). Ms. Na'im alleged that under Ms. Grafeld, "and her managers, [she continued to experience] forms of character assassination, denigration of my professionalism, and now in the administering of illegal procedures by IPS management designed to lead to the termination of my career within the organization." (Ex. G at 5).

31.     Faced with interminable and unjustified threats of termination, Ms. Na'im left IPS and took a downgraded position in the United States Passport Office on March 16, 2006. (Email dated March 10, 2006, incorporated herein as Plaintiff's Exhibit "H"). As a result, Ms. Na'im was forced to take a $10,000.00 pay reduction from a GS-12/step 7 to a GS-11/step 10. (Complaint ¶12).

32.     On or about August 15, 2006, Ms. Na'im filed a complaint charging the United States State Department with unlawful race discrimination and retaliation which incorporated the

allegations contained in her informal complaint of discrimination filed in March 2006. (Ex. A).

33.    Based on an assessment of Ms. Na'im's EEO complaint regarding her 2005 performance evaluation, Ms. Na'im was eventually given a "fully successful" 2005 rating, *after* she had left IPS and taken a substantial pay reduction. (Email dated August 21, 2006, incorporated herein as Plaintiff's Exhibit "I").

## INTRODUCTION

Intisar Na'im filed suit against the Government, her employer for the last 16 years, for its willful and malicious discriminatory acts against her on the basis of her race and unlawful retaliation. Ms. Na'im submits that the Government violated Title VII of the Civil Rights Act of 1964 when it gave her unjustifiably substandard performance evaluations and placed her on an illegal Performance Improvement Plan. Additionally, Ms. Na'im alleges that the Government created an impermissibly hostile and abusive environment because of her race and in retaliation as a result of her persistent complaints about the despicable conduct of the Government's supervisors and managers. The Government has filed a motion for summary judgment prior to the conduct of any discovery in this matter. The Government's premature motion is, on its face, wholly without merit. Moreover, Ms. Na'im submits that the conduct of discovery would not be fruitless and will adduce additional facts to rebut the Government's assertions. In short, the Government's motion for summary judgment is baseless.

## FACTS

By her civil complaint, Ms. Na'im proffered that she had been employed with the United States Department of State since 1991. By about 1999, Ms. Na'im had been an Information Analyst in the Office of Information Resources and Management Programs and Services, Requester Liaison Division ("IPS") for about three (3) years, and had risen to the grade level of

GS 12 step 5.  Her duties in that position included organizing and coordinating the information access under the Freedom of Information Act (FOIA) and Privacy Act (PA) programs. (Complaint ¶6).

On or about September 26, 2001, Ms. Na'im filed an informal EEO Complaint alleging race discrimination against her department chief Margaret Grafeld. (EEO No. 01-57).  By that complaint, Ms. Na'im alleged that Grafeld had created an impermissibly hostile environment when she subjected Ms. Na'im to racially derogatory comments during the course of Ms. Na'im's security clearance investigation and an internal evaluation of Ms. Na'im's ultimately unsuccessful candidacy for a 1999 promotion within the department.  Ms. Na'im also alleged that the Government had failed to provide her with timely performance evaluations, gave her unwarranted low performance ratings, and portrayed her in a demeaning and highly negative light professionally which undermined her work performance and professional standing. (Complaint ¶7).

 Following the filing of Ms. Na'im's 2001 EEO complaint, the pattern of discrimination and harassment against Ms. Na'im continued. (Complaint ¶7).  On or about May 10, 2002, Ms. Na'im filed an informal EEO complaint against her immediate supervisor Tasha Thian. (EEO No. 02-05).  By that complaint, Ms. Na'im claimed that the discriminatory conduct alleged under the prior EEO complaint continued under the subsequent supervision of Thian.  Ms. Na'im proffered that Thian had unfairly, and without cause or justification, provided her with untimely and unwarranted downgrading of her performance ratings in 2001 and attempted to place her on an utterly unjustified Performance Improvement Plan. (Complaint ¶8).

In May 2002, Ms. Na'im's department issued a vacancy announcement for a GS 13 position.  On May 15, 2002, Ms. Na'im applied for the position in the vacancy announcement.

Ms. Na'im was informed that she was qualified and her name was certified with other qualified candidates.  Once again, Ms. Na'im was not hired for the position.  As a result of her non-selection, Ms. Na'im filed an informal complaint of discrimination in January 2003. (EEO No. 03-09).  In July 2005, Ms. Na'im received a Right to Sue letter based upon her January 2003 failure to promote complaint. (Complaint ¶9-10).

By 2005, Ms. Na'im was placed on an unjustified "Performance Improvement Plan," forced to endure harassing "coaching sessions" and threats of termination despite the fact that Ms. Na'im consistently either met her or exceeded her production "quotas." (Complaint ¶11).

As a result of once again being placed on an unwarranted performance improvement plan, Ms. Na'im, as required of a federal employee, filed an informal EEO complaint on or about March 6, 2007.  On or about March 17, 2006, Ms. Na'im submitted a written summary of her "Allegations and Remedies" to her assigned EEO counselor, Dumar Stanley. (Ex. G).  By that written summary, Ms. Na'im alleged that Ms. Na'im proffered:

> I am alleging that this mistreatment, humiliation, and discrimination is racially motivated, and it is a direct result of a personal vendetta that IPS Director, Margaret P. Grafeld has against me, as evidence by the comments she made about me to the DS investigator during my 2001 security clearance investigation.  She does not respect me as a person, or my professionalism. (Ex. G at 1).

Ms.  Na'im further alleged that Ms. Grafeld had influenced colleagues' attitudes about Ms. Na'im's character and personality to such a degree that some colleagues allegedly felt "physically threatened" by Ms. Na'im. (Ex. G at 2).  Ms. Na'im also recounted an incident in which Ms. Grafeld commented on Ms. Na'im's "kinky" hair. (Ex. G at 3).  Additionally, Ms. Na'im alleged that under Ms. Grafeld "and her managers, [she continued to experience] forms of character assassination, denigration of my professionalism, and now in the administering of illegal procedures by IPS management designed to lead to the termination of my career within

the organization." (Ex. G at 5).

Within ten days of filing her informal EEO complaint, on March 16, 2006, Ms. Na'im left IPS for a position at the United States Passport office.  There, Ms. Na'im took a $10,000.00 pay reduction from a GS-12/step 7 to a GS-11/step 10. (Complaint ¶12).  Eventually, Ms. Na'im received a fully successful 2005 performance rating after her supervisors had succeeded in getting her out of IPS. (Ex. I).

After receiving a Notice of Right to Filed a Formal Discrimination Complaint, on or about August 15, 2006, Ms. Na'im filed a formal complaint charging the United States State Department with unlawful race discrimination and retaliation.  In her formal complaint, Ms. Na'im specifically incorporated the allegations contained in her informal complaint. (Ex. A at 2).

## **ARGUMENT**

Following the filing of its Answer, but prior to the conduct of any discovery in this matter, the Government contends that it is entitled to summary judgment as a matter of law.  Ms. Na'im, however, filed a civil complaint that provided, as required, a short and plain statement of her claims and the grounds on which they rest. See Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41 (1957).  The Government's attempt to essentially dismiss Ms. Na'im's complaint by contesting the *merits* of her claims must be summarily rejected.  Furthermore, because discovery will adduce further facts to rebut the Government's assertions, the Government's motion is woefully premature.[1]

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to render summary judgment for a moving party only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). In its initial review of the evidence submitted in support and opposition to summary judgment, the trial court may not make credibility determinations or weigh the evidence, which are jury functions, not those of the judge. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254255 (1982). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).

It is equally well-settled that the moving party bears the burden of showing that there is no genuine issue of material fact or that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In short, summary judgment is appropriate only when there are no triable issues of fact, and if the opposing papers reveal even one issue of disputed material fact, summary judgment must be denied. And, when, as here, the validity of a complaint turns on questions of the Government's motive and intent, the Court must be especially cautious in granting summary judgment. Lipsett v. U. of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988); Lewis v. AT&T Technologies, Inc., 691 F. Supp. 915, 918 (D. Md. 1988)(citing Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979)). Summary judgment, to be sure, is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. Richards v. Nat'l Rifle Assoc., 871 F. Supp. 499, 501 (D.C. Cir. 1994).

Here, the evidence submitted by the Government does not remotely meet its initial burden of showing the absence of a genuine issue concerning any material fact. Ms. Na'im

---

[1] Simultaneous with the filing of this Opposition, Ms. Na'im has filed a motion, pursuant to Rule 56(f), to conduct discovery in order to fairly oppose the Government's otherwise specious

identifies numerous issues of fact that when viewed in the light most favorable to her will not allow the Court to enter summary judgment, much less summary judgment in the Government's favor.  That these disputed facts, as outlined above, are material to the essence of Ms. Na'im's claims and the Government's defenses can hardly itself be disputed as they relate directly to matters of credibility and the ultimate issues in the case.  In sum, to the extent the Government contends that there are no disputed facts in this matter and that they should prevail as a matter of law, its arguments are without any merit.

## II.    The Government Has Failed To Establish That It Should Prevail As A Matter Of Law As To Plaintiff's Claim For Disparate Treatment Under Count I.

By its motion, the Government contends that it should prevail on plaintiff's Count I prior to discovery on the theory that a Performance Improvement Plan is, as matter of law, not an adverse employment action.  The Government's theory is wrong, and it is not entitled to dismissal of plaintiff's timely filed complaint prior to discovery.

It is, of course, settled that a plaintiff bears the initial burden of establishing that:

1)  she was a member of a protected class;
2)  she suffered an adverse employment action; and
3)  the unfavorable action gives rise to an inference of discrimination.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); EEOC v. Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001); Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002)(citing, Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  For purposes of Title VII, an employment decision rises to the level of an actionable adverse action where a tangible change in the duties or working conditions arising to a material employment disadvantage.  Walker v. WMATA, 102 F. Supp. 2d 24, 29 (D. D.C. 2000).

---

motion.

The Government claims, however, that Ms. Na'im has not suffered an adverse employment action for which to "aggrieve." (The Government's Motion at 7). In so claiming, the Government relies on <u>Taylor v. Small</u> for the supposed proposition that placement on a performance improvement plan is *never*, as a matter law, an adverse employment action. 350 F.3d 1286 (D.C. Cir. 2003). The Government's reliance on <u>Taylor</u> is wholly misplaced. As an initial matter, the Government's motion for summary judgment in <u>Taylor</u> followed the end of discovery by both parties. Moreover, contrary to the Government's thesis here, the D.C. Circuit, citing <u>Brown v. Brody</u>, 199 F.3d 446 (D.C. Cir. 1999), held that "poor performance evaluations were [not] **necessarily** adverse actions." <u>Taylor v. Small</u>, 350 F.3d at 1292-939 (emphasis added). The Government has, not surprisingly, overlooked the important principle that "no particular type of personnel action [is] automatically excluded from serving as the basis of a cause of action under" Title VII. <u>Brown v. Brody</u>, 199 F.3d at 454. Discharge, demotion, or an undesirable reassignment are only <u>examples</u> of adverse employment actions for which an employee can bring a Title VII claim. <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998). Employer actions short of outright firing can be adverse for purposes of Title VII liability. <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1130 (D.C. Cir. 2002).

Here, Ms. Na'im has alleged evidence that she had suffered a "tangible change in the duties or working conditions constituting a material employment disadvantage." <u>Stewart v. Evans</u>, 275 F.3d 1126, 1134-1135 (D.C. Cir. 2002); <u>see also</u> <u>Forkkio v. Powell</u>, 306 F.3d 1130-1131 (D.C. Cir. 2002)(reassignment with significantly different responsibilities . . . generally indicates an adverse action). That the actions by the Government during the fall of 2005 and early 2006 had an immediate effect on Ms. Na'im's employment can hardly be disputed. <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981)(en banc); <u>Mungin v. Katten Muchin & Zavis</u>, 116

F.3d 1549, 1555 (D.C. Cir. 1997). After all, Ms. Na'im has pled facts that established that even before the PIP period was to end, instead of enduring her seemingly inevitable termination, she took another job that paid her $10,000 less money. Furthermore, that Ms. Na'im finally received a fully successful performance rating for 2005 casts doubt on her supervisors' claims that Ms. Na'im's work performance was substandard, and the unlawful discrimination was the real reason for their employment decisions. In short, the Government's contention that Ms. Na'im's performance evaluations and PIP separately and in their totality, did not effect Ms. Na'im's working conditions to her detriment is just plain wrong. The Government has utterly failed to show that there exists no issue of material fact that Ms. Na'im has failed in her complaint to allege an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

### III. The Government Has Failed To Establish That It Was Not On Notice Of Plaintiff's Charges That The Government Had Created An Abusive And Hostile Environment In Violation Of Title VII.

As asserted above, in support of her informal complaint of discrimination, Ms. Na'im proffered a plethora of facts buttressing her contention that the Government had "mistreated" her and that she was the victim of personal "vendetta[s]" by her supervisors. Following the Government's informal investigation of Ms. Na'im's charges, Ms. Na'im filed a formal charge of discrimination. That charge related, as it must, directly to the claims she brought in her informal proceeding. (Discrimination Complaint Process Fact Sheet, incorporated herein as Plaintiff's Exhibit "J"). Further, in her formal charge, Ms. Na'im specifically referenced the "'Allegations & Remedies' statement I submitted to Mr. Stanley" in support of her informal complaint. (Ex. A at 2). Ms. Na'im further alleged in her formal complaint that she had been placed on the "illegal PIP "to either terminate my job or pressure me out of it." (Ex. A at 1). Ms.

Na'im also described how she was "constantly singled out" and that "everything was scrutinized to try to justify the termination of my job." (Ex. A at 2).

Despite the litany of complaints by Ms. Na'im about the hostility of her work environment, the Government protests that it was not put on "notice" that Ms. Na'im was complaining that her work environment was hostile. The Government's baseless contention must be rejected. To be sure, the term "hostile work environment" was never used in Ms. Na'im's formal charge of discrimination. The administrative charge requirement, however, must "not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths.'" Park v. Howard University, 71 F.3d 904, 907 (D.C. 1995), citing, Loe v. Heckler, 768 F.2d 409, 417 (D.C. Cir. 1985).[2] Nevertheless, there can be no mistake that a gravamen of Ms. Na'im's complaints against her employer was that she had been the subject of an abusive work environment which unreasonably interfered with his work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993). Ms. Na'im complained bitterly during the entire EEO process about "personal vendettas" and "character assassinations."[3] To deny that Ms. Na'im in her untrained written complaints was not asserting that she was the victim of a racially hostile work environment is simply denying the obvious.

The Government's anticipated reliance on Parks that Ms. Na'im's informal complaint could not provide the Government with adequate notice of her hostile work environment claim is of no moment. See, 71 F.3d at 908. Here, the informal complaint process by a federal employee

---

[2] Significantly, the standard form Formal Complaint of Discrimination provided to Ms. Na'im includes several boxes which an employee can "check" if applicable. None of those boxes, however, include a theory of recovery known to most lawyers as "hostile work environment." (Ex. A).

[3] Curiously, the Government has not proffered the EEO counselor's final report in support of its specious motion.

is integrally connected, and indeed a prerequisite, to filing a formal complaint. (Ex. J).
Moreover, Jacqueline Canton was intimately familiar with Ms. Na'im's informal EEO
complaint. (String emails dated April 28, 2006, incorporated herein as Plaintiff's Exhibit "K").
And, of course, the claims raised by a federal employee at the formal complaint stage are
specifically limited to those claims originally brought in the informal counseling process. (Ex. J).
In short, the Government's contention that it was not fairly notified of its employee's persistent
complaints made throughout the mandatory informal EEO process is laughable. Simply put, the
Government's protest on this score is without a shred of merit.

Nor does the Government's assertion that Ms. Na'im failed to establish a claim for
hostile environment by her complaint possess any merit. To survive summary judgment on her
claims of a racially hostile work environment, Ms. Na'im must of course show that a reasonable
jury could find that the Government's harassment was:

1) unwelcome;
2) based on race; and
3) sufficiently severe or persuasive to alter the conditions of employment and create an
   abusive atmosphere.

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993); Barbour v. Browner, 181 F.3d 1342, 1347-48
(D.C. Cir. 1999). Here, there can be no dispute that the government's actions were unwelcome.
Moreover, Ms. Na'im has alleged a plethora of facts at this early stage in which a reasonable jury
could infer that the government's treatment of her was severe and abusive enough to affect the
conditions of his employment. Ms. Na'im has proffered sufficient facts that show that she was
the subject of ridicule and insults to her personal "character." Nor can the government fairly
argue that the adverse actions Ms. Na'im was forced to endure were petty slights or trivial harms.
Oncale v. Sundowner Offshore Services, Inc., 523 U. S. 75, 80 (1998). Even the Government

concedes that Ms. Na'im complained early and often about the treatment she was receiving from her superiors, and the Government's contention that Ms. Na'im has failed to show at this stage in the proceedings that her work environment was permeated with ridicule and insults is utterly specious.[4]

## IV.    The Government Subjected Ms. Na'im To Disparate Treatment And Created An Abusive And Racially Hostile Environment In Retaliation For Her Filing EEO Complaints.

As the Government has pointed out, Ms. Na'im has filed numerous complaints alleging unlawful discrimination during her employment tenure at IPS dating back from at least 2001 to 2006.  On July 26, 2005, Ms. Na'im received a Final Agency Decision and Right to Sue Letter relating to her failure to promote claim.  On August  25, 2005, Tasha Thian held a counseling session and, according to Ms. Na'im, informed Ms. Na'im that she would be placed on a PIP. (Response to Memorandum of Counseling, incorporated herein as Plaintiff's Exhibit "L").  Ms. Na'im disputed the allegations which formed the basis for her supervisors' contention that her performance was "substandard." (Ex. L).  In December 2005, Thian proposed placing Ms. Na'im on the PIP, and Ms. Na'im was finally placed on that plan in January 2006.  The Government now argues that Ms. Na'im has failed, as a matter of law, to establish a causal connection between the filing of her formal charges of discrimination and the adverse employment actions in the fall of 2005 and early 2006.  The Government's contention on this score is wholly without merit.

Section 704 of Title VII, 42 U.S.C. § 2000e-3 (1994), provides that "[it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge . . . under this act." Of course, in order to establish a

---

[4] Most importantly, with proper discovery, Ms. Na'im will and can adduce additional facts to amplify her claim.

claim of retaliation, Ms. Na'im must establish that she:

1)   engaged in a protected activity;

2)   that her employers took an adverse employment action against her; and

3)   that a casual connection existed between the protected activity and the adverse action.

<u>Cones v. Shalala</u>, 199 F.3d 512, 521 (D.C. Cir. 2000); <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002); <u>Brown v. Brody</u>, 199 F.3d 46, 452 (D.C. Cir. 1999).  As even the Government concedes, Ms. Na'im engaged in "protected activity" when she filed her various Charges of Discrimination**.**  The Government further concedes that for purposes of establishing unlawful retaliation, Ms. Na'im has alleged an adverse employment action.  The Government's complaints that Ms. Na'im has failed to establish a causal connection between the filing of her complaint and the retaliatory conduct is utterly devoid of merit.  Taking the facts in the light most favorable to Ms. Na'im, the time lapse between the issuance of Ms. Na'im's Right to Sue letter and Thian's unsatisfactory performance evaluation and counseling session one month later was certainly *de minimus.* <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 271-274 (4th Cir 2001).  Even the six month lapse between the final agency decision dismissing Ms. Na'im's failure to promote claim against her supervisors and the actual implementation of the PIP that the Government relies upon cannot, by itself, support the Government's contention that Ms. Na'im can prove no set of facts establishing an inference of unlawful retaliation.

Most importantly, it is well-settled that a temporal relationship between the protected activity and the subsequent adverse action is merely *one way* in which a plaintiff may establish a causal connection.  Given the many complaints by Ms. Na'im against her supervisors and what even the Government describes as "not a match made in heaven," the Government cannot

establish, even before discovery, that Ms. Na'im can prove no set of facts establishing a connection between her imposed work conditions in 2005 and 2006 and her various EEO complaints. This is particularly true here where Ms. Na'im ultimately received a 2005 performance rating substantially higher than Ms. Thian was determined to give her for the same period. Nevertheless, Ms. Thian's actions had the intended consequences: neither she nor her professional colleagues would have to put up with Ms. Na'im's relentless invocation of her federally protected rights.

As this Court has recently held, "at the prima facie stage of a retaliation claim, a plaintiff's burden is 'not great; [she] merely need to establish facts adequate to permit an inference of retaliatory motive.'" Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006), citing, McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984). In short, Ms. Na'im has met her initial minimal burden and established a causal connection between her EEO litigation and her supervisors' incessant campaign to terminate her from her employment.

In sum, Ms. Na'im has raised an abundance of facts upon which a reasonable jury could and must conclude that she was the target of unlawful employment discrimination because of her race.

Respectfully submitted,

/s/ Lisa Alexis Jones
Lisa Alexis Jones, Esq.
Lisa Alexis Jones, PLLC
1200 G Street, N.W., Suite 800
Washington, D.C. 20005
(202) 434-4507
(202) 434-8707 Fax
orbitcv@erols.com

*Counsel for Plaintiff*

Dated: October 26, 2007

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 26th day of October 2007, I caused to be served via ECF the

foregoing Opposition to The Government's Motion for Summary Judgment to:

>   Fred E. Haynes, Esq.
>   Assistant United States Attorney
>   Civil Division
>   555 4th Street, N.W., Room E-4110
>   Washington, D.C.  20530

>                               /s/ Lisa Alexis Jones
>                               LISA ALEXIS JONES, ESQ.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTISAR R. NA'IM | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|       v. | )  Civil Action No. 06 CV 2237 (RMU) |
| | ) |
| CONDOLEEZA RICE | ) |
| | ) |
|       Defendant. | ) |
| _____ | ) |

**<u>PROPOSED ORDER</u>**

     Upon consideration of Defendant's Motion for Summary Judgment, plaintiff's opposition thereto and the record herein, it is on the _____ day of _____, 2007, hereby

     **ORDERED**, that defendant's motion be and hereby is **DENIED**.


                                _____
                                Ricardo M. Urbina
                                United States District Judge

Copies to:

Lisa Alexis Jones, Esq.

Fred E. Haynes, Esq.

## FORMAL COMPLAINT OF DISCRIMINATION

Your name: ___Intisar Rafiah Na'im___      U.S.
Citizen: YES × NO ☐
Telephone No: (*Work*) (202) 955-0580 _____ (*Home*) (703)█████

Address: 9555 Blake Lane #103, Fairfax, VA 22031-1784

Are you working for the Federal government? YES ×NO ☐
Are you: Employee × Applicant ☐ FSN ☐ Contractor ☐ Other (*Specify*): _____
Title and Grade of Current Position: _GS-11/Step 10_
Current Employer: ___U.S. State Dept. Office of Passport Services CA/PPT/WN-SA-17
Address: 1111 19ᵗʰ St., N.W., Washington, D.C. 20522
Do you have a representative? YES ☐ NO ×
If yes, name of representative _____
Address: _____

Bureau/Office/Post where you believe the discrimination took place: A/RPS/IPS/RL/RC-SA-2
Date(s) alleged discrimination occurred: (*month, day, year*) _____

**Why do you believe you were discriminated against? (Check all that apply)**
☐ Race (*Specify*) African American    ☐ Sex (*Specify*) _____
☐ Color (*Specify*) _____    ☐ Age (*Specify*) _____
☐ National Origin (*Specify*) _____    ☐ Religion (*Specify*) _____
☐ Disability (*circle one*): Mental or Physical (*Specify*) _____
× Reprisal (Identify earlier event and/or opposed practice, give date) 9/26/2001-EEO/ADR
No. I/57-01/ Margaret P. Grafeld & 4/10/2002-EEO/ADR I/05-02 with Tasha Thian.
☐ Sexual Orientation
Have you discussed your complaint with an EEO Counselor? YES × NO ☐
Did you receive a copy of the EEO Counselor's report? YES ☐ NO ×
Name of EEO Counselor: Mr. Dumar G. Stanley
Date of final Interview: June 16, 2006
Explain specifically how you were discriminated against (treated differently from other employees or applicants) because of your race, color, religion, sex, national origin, age, mental or physical disabilities, reprisal or sexual orientation. (*attach additional sheets, if needed*): I underwent two EEO/ADR mediations under A-Bureau-IPS management, first with the Director of IPS-Margaret P. Grafeld and a second with supervisor, Tasha Thian. And a pending lawsuit against that office, EEOC case no. 100-2004-00074X, Agency No. 03-09. I allege that as a result of that lawsuit and the two EEO/ADR's I continued to experience reprisal from A/IPS management and personnel officials up to the time of my departure from my former office, and that they put me on an illegal Performance Improvement Plan (PIP) to either terminate my job or pressure me out of it. I alleged during both of these mediations that I was not treated fairly in terms of my PE ratings, did not receive interim progress reports on several occasions, did not always receive my PE



period, despite FAM 2825.6 & .7 regulations. All of my other colleagues were given PE interim progress reports and PE ratings on time. I was not. And, as for the final 2005 PE rating period, I was not given an interim progress report, and I was put in an illegal PIP first by Tasha Thian and Charlene W. Thomas, which continued under Mary Casto. I was not given a copy of my rating for this period before or after I left that office. I was constantly singled out and called into "PIP" meetings for case work situations that were overlooked by IPS managers from other colleagues. Everything that I did was scrutinized to try to justify the termination of my job, including verbal threats made by both Tasha Thian and Charlene W. Thomas that I would be fired from my job if I did not "improve."

What remedies and relief are you seeking? _I asked for a "Full Satisfactory" copy of my 2005 PE, something in writing as to the reasons why I was put on the PIP, and a written statement from Central Personnel (HR/EP) indicating their approval/permission granted to A/EX or A/IPS to put me on the PIP as per the requirements of the FAM, along with other remedies in the Allegations & Remedies" statement I submitted to Mr. Stanley.

Have you filed a grievance or appealed to MSPB on the matter(s)? YES ☐ NO ×

| | |
|---|---|
| **Complaint Signature** | _8/15/06_____<br>**Date** |

| From: | "Na'im, Intisar R" <NaimIR@state.gov> |
|---|---|
| To: | "Barnes, Christopher D" <BarnesCD@state.gov>; "Bishop, Anthony" <BishopA2@state.gov> |
| Sent: | Thursday, January 19, 2006 2:05 PM |
| Subject: | RE: Performance Meeting--Rescheduled |

Chris and Anthony,

Please be advised that the PIP meeting between IPS management and myself is set for next Monday, January 23, 2006 at 2:30p.m.   Therefore, I am respectfully giving

you both a heads up and requesting union representation at that meeting.

Thank you.

Intisar R. Na'im

A/RPS/IPS/RL/RC-SA-2

Rm. 8006

(202) 261-8317 or x4-8317

*This Message is Unclassified in Accordance with E.O. 12958*

*Our Mission is to Meet the Information Needs of Our Customers & the United States Government*

-----Original Appointment-----
**From:** Na'im, Intisar R
**Sent:** Thursday, January 19, 2006 12:59 PM
**To:** Thomas, Charlene W
**Subject:** Accepted: Performance Meeting--Rescheduled
**When:** Monday, January 23, 2006 2:30 PM-3:30 PM (GMT-05:00) Eastern Time (US & Canada).
**Where:** 1st Floor Conference Room-SA-2



EXHIBIT

B

ALL-STATE LEGAL®

**From:** "Na'im, Intisar R" <NaimIR@state.gov>
**To:** "Thomas, Charlene W" <ThomasCW@state.gov>; "Casto, Mary T" <CastoMT@state.gov>
**Cc:** "Tyler, Eva O" <TylerEO@state.gov>; "Barnes, Christopher D" <BarnesCD@state.gov>; "Bishop, Anthony" <BishopA2@state.gov>; "Bell, Lisa M" <BellLM@state.gov>
**Sent:** Thursday, March 09, 2006 7:00 PM
**Subject:** RE: A copy of the 2005 PE progress report Tasha Thian wrote for my performance and her memo to Charlene related to my performance during the 1/1/05-through 12/31/05 rating period

Thank you, Charlene, I am in receipt of the December 22, 2005 memo from Tasha Thian indicating my 2005 work performance.

And, I understand, as per your further comments on the subject, that this is only thing that you and Mary have from Tasha, in response to my written and verbal inquiries, as well as that of Chris's last January 2006, for the 2005 rating that determined my being placed on a PIP.

Please note that I have never received a 2005 PE rating or interim progress report of my work performance from either Tasha or other IPS management. Likewise, until you handed me that memo, Tasha never formally discussed one-on-one my work performance during the 2005 PE rating period.

Furthermore, you said that the last PIP meeting will be on 3/23/06 at 3:00p.m. in the first floor conference room.

Towards that end you and Mary provided me with 24 new cases and said that I have to process them with minimum errors, etc., and get them out to the requesters by that date.

When I asked you what will occur after that last PIP meeting, you replied that you would let me know something at that time.

Intisar R. Na'im

A/RPS/IPS/RL/RC-SA-2

Rm. 8006

(202) 261-8317 or x4-8317

*This Message is Unclassified in Accordance with E.O. 12958*

*Our Mission is to Meet the Information Needs of Our Customers & the United States Government*

**From:** Na'im, Intisar R
**Sent:** Monday, March 06, 2006 12:12 PM
**To:** Casto, Mary T
**Cc:** Thomas, Charlene W; Tyler, Eva O; Barnes, Christopher D; Bishop, Anthony; Bell, Lisa M
**Subject:** A copy of the 2005 PE progress report Tasha Thian wrote for my performance and her memo to


ALL-STATE LEGAL

**EXHIBIT**

C

Page 2 of 2

Charlene related to my performance during the 1/1/05-through 12/31/05 rating period
**Importance:** High

SECOND REQUEST  Please reply


Good evening, Mary.


Could I please have a copy of my 2005 PE interim progress review from Tasha, and a copy of the memo that she issued to Charlene which indicated my poor performance during this rating period, and the resultant review/determination, which preceded my current Performance Improvement Plan (PIP)?

I believe that Charlene mentioned in one of the recent meetings with me that the memo is what determined management's decision to place me on a PIP.  And, I've never received an interim progress review from Tasha, or a copy of that report.

Thank you in advance for your attention to this matter.


Intisar R. Na'im

A/RPS/IPS/RL/RC-SA-2

Rm. 8006

(202) 261-8317 or x4-8317

**From:** "Meador, Lytigna R" <MeadorLR@state.gov>
**To:** "Thomas, Charlene W" <ThomasCW@state.gov>; "Casto, Mary T" <CastoMT@state.gov>
**Cc:** "Bishop, Anthony" <BishopA2@state.gov>; "Barnes, Christopher D" <BarnesCD@state.gov>
**Sent:** Friday, January 13, 2006 12:41 PM
**Subject:** 1/13/06 meeting with Charlene and Mary re my performance and the Performance Improvement Plan (PIP) that IPS management purposes to place me on

Good morning, Charlene and Mary.

As per our meeting this morning in which you both stated that according to Eva that I am producing my expected weekly case load, and that I still have some quality-related work issues, and of which I acknowledged the productivity, nevertheless, you informed me that you request my presence at a meeting next Wednesday, January 18, 2006 to discuss my being placed on an official Performance Improvement Plan (PIP). Please note that Eva has never come to me to discuss anything about my case work, positive or otherwise.

Charlene explained that my being placed on a PIP is in response to Tasha Thian's memo stating that I have not performed satisfactorily in my job performance during the last rating period from January 1, 2005 through October 31, 2005. Please note that Tasha never came to me to discuss anything about my performance throughout the 2005 rating period, nor did she go over a 6-month progress interview with me, only calling me into meetings with your and herself, and A-bureau personnel, one of which she made remarks about my job being threatened, and that I could be removed from my position based upon my negative work performance.

I replied that I have some issue with being placed on a PIP after the fact, that since Tasha has left, and that, as you acknowledged that I am performing up to par "for now," that the PIP is to ensure, in your words, that I continue to do so.

I replied to you that as I have always reiterated that I did not meet my product on many occasions as Tasha did not give me the work to do so. And, that my performance is based upon the opinion of a supervisor that I underwent an EEO/ADR with, and that had negative personal opinions about my work and professionalism prior to coming on board as my supervisor, and continued to do so until she was removed from our division.

I added that, and showed you the e-mail from Lee Brand who is the consultant for the ISO 9001-2000 project that we are undergoing, and that he told you

and you both acknowledged that I performed well in the two day class, and congratulated me for that performance.

Subsequently, I asked that how IPS management continues to have an issue with my performance or competency, when I have demonstrated in my work performance and in this training, my abilities and competency.

Likewise, in the meeting, you asked that I give you an answer as to my plans to attend the Wednesday meeting, or if the timing is alright for me, and that I could also notify the union for representation at the meeting which is set for 3:00p.m. next week. You added that this is the last meeting with me, before you place me on an official PIP.

I responded that I would notify the Union and ask for representation. I will get back with you on the meeting date upon contact with the union.

EXHIBIT

ALL-STATE LEGAL®

5

I respectfully request our meeting concerning this coming meeting, justification for the PIP, and that I am performing up to par, despite the intention to place me on a PIP.

Thank you in advance for your attention to this matter.

Intisar R. Na'im, Program Analyst

A/RPS/IPS/RL/RC-SA-2

Rm. 8006

(202) 261-8317 x4-8317


*This Message is Unclassified in Accordance with E.O. 12958*

*Our Mission is to Meet the Information Needs of Our Customers & the United States Government*

**From:**    "Na'im, Intisar R" <NaimIR@state.gov>
**To:**    "Canton, Jacqueline A" <CantonJA@state.gov>
**Cc:**    "Barnes, Christopher D" <BarnesCD@state.gov>; "Bishop, Anthony" <BishopA2@state.gov>
**Sent:**    Tuesday, February 28, 2006 3:32 PM
**Subject:**    Request to file an EEO Retaliation and Reprisal complaint againnst IPS management

Good evening, Mrs. Canton.

As per our conversation this morning, I am respectfully requesting an EEO counselor and I would like to file a reprisal and retaliation complaint against my office, Information Resources Programs & Services (IPS).

Please contact me at your earliest convenience, preferably via e-mail for this purpose.

Thank you in advance for your consideration in this matter.

Ms. Intisar R. Na'im

A/RPS/IPS/RL/RC-SA-2

Rm. 8006

(202) 261-8317 or x4-8317

*This Message is Unclassified in Accordance with E.O. 12958*

*Our Mission is to Meet the Information Needs of Our Customers & the United States Government*



EXHIBIT

E

**From:** "Na'im, Intisar R" <NaimIR@state.gov>

To:

To:

Intisar R. Na'im
3/7/06 EEO Complaint

March 17, 2006

## Allegations and Remedies

### Allegations:

- I am alleging that I am experiencing reprisals and retaliations from IPS managers, resulting from, and of which have accelerated following the outcome of the September 26, 2001 Informal EEO/ADR case No. I/57-01, in which I won a settlement and agreement against IPS Director, Margaret P. Grafeld, and Deputy Assistant Secretary Frank M. Machak.

- I am alleging that this mistreatment, humiliation, and discrimination is racially motivated, and it is a direct result of a personal vendetta that IPS Director, Margaret P. Grafeld has against me, as evidence by the comments she made about me to the DS investigator during my 2001 security clearance investigation. She does not respect me as a person, or my professionalism.

- For example I cite the following comments from the 3/16/01 DS investigation report, in which Mrs. Grafeld told Mr. Paul Conroy in regards to my being denied a promotion under the AR-1949 cert for a Program Analyst GS-13. (I made the cert for that position and OPM notified me in writing on 9/10/99 that I was qualified for the position.) And, in remarks she made about my personal appearance during a first encounter:

- Source (Margaret P. Grafeld) further advised that in 08/1999 that employee was one of several candidates being considered for promotion to GS-13 and was interviewed by a panel on which source was a member. She described "employee (Ms. Na'im) as answering questions posed to her in a rapid-fire and rambling manner…" "(She advised that she and the panel agreed that employee was unsuited for promotion to that position, which would have increased her telephone contact with the public…"

EXHIBIT

ALL-STATE LEGAL®

6

- I have never been without access to a telephone throughout my career. I have a telephone at my desk as of this writing.

- "…She (Margaret P. Grafeld) concluded that "she did not know me (employee) well enough to offer a recommendation, but questions her character due to her behavior at work." It is common knowledge within IPS that a Caucasian woman, Karen French, broke down during that interview, and ran out crying "she failed…" Not only did this individual receive a GS-13 Program Analyst promotion, she is now a GS-14 supervisor. Moreover, it is alleged that she is one of the two sources who provided derogatory comments about my character under the protection of the K5 exemption to DS investigator, Paul Conroy. My security clearance investigation BI documents reveals that she spoke with Mrs. Grafeld about my behavior, and how she felt "threatened" by me.

- Likewise, there are K5 exemptions for two sources that provided confidentially protected comments about me in that DS report. My current supervisor, then former team leader, Mary Casto is also mentioned in the DS security clearance report as allegedly providing derogatory comments about my character to the investigator. Another Caucasian woman, she was also promoted to a GS-13 Program Analyst under the AR-1949 cert. and has been promoted further to a GS-14 supervisor.

- For example, I cite the 3/16/01 DS investigation report in which Mrs. Grafeld told Mr. Paul Conroy, that "…acting team leaders Karen French and Mary Casto have all complained to source (Margaret P. Grafeld) that they felt physically threatened by employee, and calls were made to Security concerning employee's behavior."

- I am alleging that Mrs. Grafeld also influenced both Mrs. French's and Mrs. Casto's attitudes about my character and personality. She rewarded them both accordingly.

- I am alleging that Mrs. Grafeld made a negative statement about my personal appearance in a first encounter in 1990. I had just come on board in the former FPC on 9/24/90, and approximately 1 or 2 days

together, an older, Caucasian gentleman, while passing me, along with another man of the same race, complimented my long, naturally curly black hair, (he said "look at her pretty curly hair") and before I could thank him, a woman passing by commented loudly, and angrily, "kinky-curly" --"to which I replied, "Thank you Ma'am, and I wouldn't have it any other way, either, thank you." She walked away sheepishly. The gentleman, whom I did not know, was visibly upset and embarrassed, and I was taken aback, as I had never been spoken to or about in such an obviously, racist and hateful way before then. This was my first encounter with this individual.

- After the encounter, I told then co-worker, Yvonne Evans about the incident, and described the woman, to which she replied, "that's Peggy" Grafeld. I eventually told other colleagues how she insulted me. I did not know this woman or her name, before that encounter. Nor did she know me, or have reason to insult my physical appearance.

- I am alleging that my winning the 2001 Informal EEO/ADR Case No. I/57-01 against her administration accelerated the mistreatment, humiliation, and discrimination I've experienced within IPS by managers under her administration. She is fully aware of the mistreatment I've received by IPS supervisors, team leaders, etc., and as our director, is fully responsible for these actions. I've brought this matter to her attention in e-mails, memos, etc., and she has consistently ignored them, and has done nothing about the situation.

- During a recent re-alignment within IPS, I filled out a survey from Mrs. Grafeld, requesting to be re-assigned. I was not re-assigned, and Requester Liaison Division Chief (RL) Charlene W. Thomas, who is African American, and has been on board within IPS for less than three years, responded in one of the "coaching sessions" I was forced to undergo, "that I have not performed satisfactorily," therefore I will not be re-assigned. No prior discussion was ever held with me indicating that I would not be re-assigned. I believe that I was one of only 5 to 7 persons who were denied the opportunity of working in some new capacity within the IPS organization.

- I am alleging that IPS Director Margaret P. Grafeld is directing the adverse actions of IPS managers against me, regardless of the race of the supervisor or team leaders.

- For example, former supervisor, Tasha Thian did not know me when she finally discussed my 2001PE rating with me on January 25, 2002 at approximately 3:00p.m. in my office. She told me that the "other supervisors told her that I 'shout at them,' 'that my voice is loud.' She added that she could see how they concluded that, but she could "deal with my voice." She further suggested that I move on with my career elsewhere, and added that "sometimes a person has gone as far as they can within an organization..."

- As a further example of this bias against my personality, and professionalism I cite Mrs. Thian's comments to EEO counselor, Mrs. Alberta Manley during the 2002 reprisal complaint investigation, in response to the question as to why she hadn't me the 2001PE rating: that "On October 16, 2001, she was told by the 'chain of command' to hold off discussion about Ms. Na'im's work performance." Upon further questioning by the EEO counselor, she identified Debra Steel-Jones, former RL Division Chief, and IPS Director, Margaret P. Grafeld, as the "chain of command." During the course of the informal fact-finding investigation, Mrs. Thian said that I had a "loud voice," and that I did not "communicate" with others in the office, and continued to refer to the first EEO/ADR I/57-01 in the presence of Mrs. Manley, who had to admonish her to concentrate upon the present situation, as she was not on board in our office during that mediation.

- Likewise, Mrs. Thian told Mr. Robert Metzler during the EEO investigation leading to the current pending EEOC case no. 100-2004-00074X, Agency No. 03-09, that "she supervised Ms. Intisar Na'im..." "...to be promoted to a GS-13, you have to be flexible, a hard worker, someone who can work with people, able to brief, an all around expert." She said that "she didn't see this in Ms. Na'im yet." She said "Ms. Na'im had a lot of work to do to get to that level." She said that "Ms. Na'im has to prove herself before she could get promoted."

Mrs. Thian, in direct response to my first EEO/ADR I/57-01 under Mrs. Margaret P. Grafeld, and the second EEO/ADR case no. I/05-02, under former supervisor and RL/RC Branch Chief, Tasha Thian.

- I am alleging that in addition, in response to/following my impending court case EEOC No. 100-2004=00074X, Agency No. 03-09, it has taken the form of a "setting me up for failure," under a Performance Improvement Plan (PIP) with the intention to terminate my employment thereby.

- I am alleging that the retaliations and reprisals I continue to experience in IPS under Mrs. Margaret P. Grafeld, and her managers, have been in the forms of character assassination, denigration of my professionalism, and now in the administering of illegal procedures by IPS management designed to lead to the termination of my career within the organization. They have accelerated these illegal procedures against me in retaliation to my prior EEO/ADR actions, and pending court case. When one supervisor leaves, another picks up where the other left off, and that it is being directed by IPS Director Margaret P. Grafeld. It has resulted in my being placed on an illegal Performance Improvement Plan (PIP) after the accusing supervisor, Tasha Thian, left, and following "coaching sessions," that were administered against me without my receiving a 2005PE rating and one-on-one interim progress report, from that supervisor, and as such are indicative of reprisals and retaliations proceeding from the above mention legal actions.

- First by the supervisor that I underwent the second EEO/ADR case no. I/05-02 with, Tasha Thian, and now by a former RL/RC-team leader, Mary Casto, who along with another former team leader, Karen French, allegedly gave negative, derogatory comments about me to the DS-investigator under K5 exemptions with the intention to cause the termination of my career.

- I allege that IPS management, Director Mrs. Margaret P. Grafeld, in particular and IPS managers in general, have thoroughly disregard the

agreement, item #10 in enacting reprisals and retaliations against me.

- That settlement agreement stated under Item #10., that "*__in accordance with the law and agency practice, agency officials will not retaliate in any way against the Aggrieved Party for his/her participation in the Equal Employment Opportunity process, nor provide any negative references concerning her employment with the Department.__*"

  - I allege, therefore, that the current PIP is a continuation of the negative bias that IPS management has towards me and my professional career, is a form of reprisal and retaliation, and it is being used in a punitive manner to justify the grounds for termination of my job within the organization. This was the intended purpose of the negative, derogatory comments given to the DS investigator during my 2001 security clearance investigation, the intentional downgrading of my PE ratings, and in some cases, not providing me with interim progress reports and/or annual EER ratings. Some of the same individuals involved in the Security Clearance investigation are also involved in the PIP application. And, it is the basis for the continual negligence in their providing me with a timely, and accurate PE rating, interim progress report.

  - These reprisals and retaliations continue under the veneer of an African American RL/RC division chief, Charlene W. Thomas. Of, which the 3/3/06 Performance Improvement Plan (PIP) is the current mechanism by which IPS management, Mrs. Margaret P. Grafeld, in particular, and IPS managers in general, is using under the administration of this African American woman in trying to remove me from my current GS-12/Step 7 Program Analyst position.

  - Mrs. Thomas and Mrs. Thian have repeatedly threatened my job in the various "coaching sessions" I was forced to undergo under their administrations.

- For example, in the October 14, 2005 10:00a.m. "coaching session" with Mrs. Thomas and Mrs. Thian, Mrs. Thomas said that I brought my production up to par with 16 cases, and that she was "proud of me, and "happy." Charlene added that she "didn't want to start a job termination action against me. But, she added that I need to keep my production up for the next 3 weeks, and that we will meet again on 11/1/05 with Mary. Charlene also warned that despite my 16-17 years of experience that my case processing is below that of my lesser experienced colleagues. (Please note that on January 25, 2006, the "Freedoms" data-base indicated that from 1/1/31/05 through 12/31/05, that I processed 231 FOIA/PA cases, in a number consistent with/comparable to that of two other RL/RC-1 GS-12 Program Analysts: 88 more cases than one other analyst, and 12 cases less than another, both doing the same type of case work.)

- I replied that I wanted to be consistent, that I did not always get my cases in a manner in which I would be allowed to make my production. I added that I did not always get my cases early during the week to make my productions. I reiterated that if I receive the cases at the start of the work week, then I could make my production-not when I get them on Thursdays, and Fridays, and still be expected to make a 12-case production quota, at the end of the work week.

- In the current PIP sessions and some of the past "coaching sessions" Mrs. Casto has gone along with Mrs. Thomas' negative assessment of my case work, performance, etc. In the PIP sessions, every mistake that I make in case processing is highlighted, and anything that I "improve" upon, or maintain positively is ignored.

- I am being blamed for the same "mistakes" that other IPS Program Analysts are failing to do--catch/correct errors inherent in the template letters, although IPS/RL/RC management stated last November, 2005 in office meetings that they would correct the templates.

Acknowledgment letters with mistakes by other analysts have been cleared by IPS managers, while every error that I make is being pointed out in the PIP meetings with Charlene and Mary. Some insertions that are based upon the interpretation of the particular analyst handling the case, are being used as examples of errors in my cases, and are pointed out and weighed against me to justify the assertion by IPS managers that I am incompetent.

- Despite repeated requests from both the AFGE Union Local 1534 Second Vice President, Chris Barnes, and 2 e-mail correspondences from me, IPS management has not provided me with a 2005PE rating, nor conducted an interim progress report.

- My case work is "micro-managed by IPS management, Charlene and Mary in the former "coaching sessions," and now PIP, for every error possible. It is to be understood based upon the language in the PIP that I will be terminated when it is over as I have failed to improve. I asked Charlene during the last PIP session on Thursday, March 9, 2006, what will happen after the last PIP session on March 23, 2006. She replied that she did not know, that they will inform me of the situation at that time.

- My desk was placed directly across the aisle so that team leader, Eva Tyler could observe my movements. Charlene said in the last PIP meeting that she reports back to them my daily case work productivity/progress, etc.

- IPS management put me on a PIP after Tasha Thian was re-assigned to another division within the office, although Charlene said in the "coaching sessions" and via e-mails, that I was making my production, and sometimes exceeded the quotas of 12 cases weekly.

- I returned from a short vacation on 9/13/05, and Charlene called me into her office at approximately 11:35a.m., and said that I should bear with the situation, as Tasha will be going, and that these "coaching sessions" will end when she goes, and that she would not involve Mary in further sessions. She also asked that I

Tasha gave me before I left.

Other punitive/retaliatory actions against me by IPS managers include:

- Tasha Thian tried to put me on a PIP for the 2003PE rating period, while asserting that I had performed unsatisfactorily during that rating period. Acting RL Division Chief, Audree' Holton did not agree with her decision, and wrote a higher review contrary that was contrary to her assertions. Therefore, Tasha failed to finalize this action.

- Tasha Than tried to withhold my Within Grade Increase (WIGI) during the 2004PE rating period, to try to indicate that I had performed unsatisfactorily within that rating period. Again, she failed to finalize this action. In response, she did not put in for my WIGI, and I was forced to wait more than a year and a half later to receive it retroactively.

- IPS management forced me off of my 10-hour Alternative Work Schedule (AWS) with every Monday off, despite my providing the required medical documentation requesting accommodation to stay on that schedule, IPS Director Margaret P. Grafeld's initial written approval of that AWS schedule on 4/16/99, with disregard to medical records that my doctors provided, and input from the Office of Medical Services. Charlene said that "Peggy doesn't want me on that schedule," and that "I knew it was coming." She added that because I informed Peggy under an earlier re-alignment request e-mail that I wished to remain on the 10-hour AWS schedule, which the latter determined was illegal that was why I was being removed there from.

- The AFGE Local 1534 union representatives, First Vice President, Anthony Bishop and Second Vice President, Chris Barnes asked IPS manages Charlene, Mary, and A-bureau HR specialist, Lisa Bell to put me on a 9 hour AWS. They did not comply until approximately 3 weeks later.

- In the February 14, 2006 "coaching session," Charlene told AFGE Union V.P. Chris Barnes that I "was the cause of the IPS backlog- that because I kept a consistent backlog of cases on my desk, that is why they have a backlog. She proceeded to indicate that during the last week of October, 2005, that I had approximately 98 cases on my desk. I respectfully disagreed, and provided the 10/24/05 through 11/4/05 weekly which indicated that I received 38 cases on that Friday. That over wise, I did not have a backlog before receiving these cases.

## Remedies

I am respectfully requesting the following remedies:

- I want my 2005PE rating with an "excellent" performance rating.

- I want the illegal Performance Improvement Plan (PIP) immediately rescinded, and something in writing put into my OPF indicating that it was illegally administered against me.

- I want all negative, derogatory comments made by IPS managers, team leaders and colleagues, which have been proven to have no basis, to be remove/expunged from my OPF and DS Background Investigation/Security Clearance files, and an apology to me placed therein.

- I want my 10 hour compressed AWS schedule restored immediately with every Monday off.

- I am actively putting out my resume' and seeking employment elsewhere. I intend to move out of the organization.

**From:**   "Na'im, Intisar R" <NaimIR@state.gov>
**To:**     "Holliday, C Pam(CA/PPT/WN)" <HollidayPC@state.gov>
**Cc:**     "Lytell, Melissa D" <LytellMD@state.gov>
**Sent:**   Friday, March 10, 2006 10:06 AM
**Subject:** Passport Specialist position in CA/PPT

Good Morning, Pam.

How are you doing this morning?

I am hereby informing you that I will accept the position that you offered, and that I can come on board any time after next Thursday, March 16, 2006.

Thank you.

Intisar R. Na'im

A/RPS/IPS/RI/RC-SA-2

Rm. 8006

(202) 261-8317 or x4-8317

Cell-phone (571) 332-2786, home phone: (703) 246-9064

### This Message is Unclassified in Accordance with E.O. 12958

### Our Mission is to Meet the Information Needs of Our Customers & the United States Government



**From:** "Naim, Intisar R" <NaimIR2@state.gov>
**Sent:** Monday, August 21, 2006 5:44 PM
**Attach:** Document.pdf; Document.pdf
**Subject:** FW: '05 Rating

---

**From:** Bell, Lisa M(Arlington)
**Sent:** Monday, August 21, 2006 2:52 PM
**To:** Naim, Intisar R(CA/PPT/WN)
**Cc:** Schechter-Torres, Julie
**Subject:** FW: '05 Rating

Intisar,

I have copied and pasted your points from below and responded in pink next to each point.

.1) I am requesting a fully satisfactory 2005PE rating. Julie Schechter Torres arranged for your 2005 fully successful rating to be faxed to you on 8/19/06. I do need to obtain your signature on the original copy of the rating to close it out.

.2) I requested that A/IPS or A/EX put into writing/provide a written statement as to the reasons why I was put on a PIP. The reasons for your being placed on the PIP are outlined in the PIP document itself. I have attached a scanned copy of the PIP document that you received for your records.

3.) I requested that A/IPS or A/EX put into writing/provide a written statement verifying that the Department's Central HR Office (HR/ER) gave their approval/permitted A/IPS or A/EX to put me on the PIP. According to the FAM regulations this was required. I have scanned the clearance for the PIP provided by HR/ER.

Regards,

Lisa

Lisa Bell, A/EX/HRD
A, OES & DRL Bureaus & S/CRS
Room 1203, SA-27
Tel: (703) 812-2319
Fax: (703) 812-2334
BellLM@state.gov

Click here to evaluate my customer service:
http://aexhrd.a.state.gov/survey/iview.asp?sid=440

---

**From:** Schechter-Torres, Julie
**Sent:** Friday, August 18, 2006 2:27 PM
**To:** Naim, Intisar R(CA/PPT/WN); Ford, Melinda M.
**Cc:** Moy, Barbara W; Stanley, Dumar G; Bell, Lisa M; Lytell, Melissa D
**Subject:** RE: '05 Rating

Ms. Na'im,
As you requested, we will fax your evaluation to the passport office this afternoon. My colleague,



EXHIBIT

1

U.S. DEPARTMENT OF STATE
OFFICE OF CIVIL RIGHTS

# Discrimination Complaint Process Fact Sheet



> This document outlines steps in the discrimination complaint process in accordance with 29 C.F.R. 1614. However, it should be noted that an aggrieved person and the Department can agree to resolve the matter at any time.

## Policy

The policy of the U.S. Department of State is to provide equal opportunity in employment to all persons without regard to race, color, religion, sex, national origin, age, disability, or sexual orientation; and to achieve equal employment opportunity in all personnel operations through a continuing affirmative program. While it is also Department of State policy not to discriminate against persons on the basis of marital status or political affiliation, the Department's EEO complaints process is not available for such complaints. Individuals instead should avail themselves of the appropriate grievance procedures, prohibited personnel practice, remedies and/or courts for relief.

No person shall be subject to retaliation for opposing any practice made unlawful by Title VII of the Civil Rights Act of 1964, as amended (Title VII), the Age Discrimination in Employment Act (ADEA), the Equal Pay Act, the Rehabilitation Act, or for participating in any stages of administrative or judicial proceedings under these statutes.

All individuals subject to Department of State supervision or control are required to cooperate with S/OCR and its authorized agents upon request. Failure to do so could subject the Secretary of State to liability for discrimination for discrimination based on an adverse inference.

## Scope/Coverage/Applicability

**Definition:** The discrimination complaint process is an administrative process to resolve disputes alleging acts of employment discrimination made unlawful by equal employment opportunity (EEO) laws, regulations, and statutes.

**Availability**:  The discrimination complaints process is available to any U.S. citizen subject to the supervision or control of the Department of State or who is/was an employee or applicant for employment with the Department of State.

Applicants for employment and former employees are not eligible to seek redress under negotiated grievance procedures.

**Foreign Service Nationals (FSNs):**  For information about the Department's non-discrimination policy, practices, and protections for Foreign Service Nationals (FSNs), visit the Bureau of Human Resources website (**http://hrweb.hr.state.gov/oe/hrm/equality.html**) on the Intranet**.**

**Sexual orientation**:  Department policy prohibits discrimination based on sexual orientation; however, such discrimination is not statutorily prohibited by Title VII. An employee or applicant for employment who feels he/she has been discriminated against on the basis of sexual orientation may file a complaint pursuant to the Department's administrative procedures (3FAH-1 H-1520).  Employees may also have the option of pursuing redress to issues related to sexual orientation through an appropriate negotiated grievance procedure.

**Pre-Complaint Processing**

Contacting an EEO Counselor is the first step in the discrimination complaint process. The purpose of EEO counseling is to attempt early resolution of discrimination complaints on an informal basis.  EEO Counselors represent neither the complainant nor management, nor do they serve as investigators or advocates.  An EEO Counselor will answer inquires about the discrimination complaint process and explain available options. They are trained to conduct inquiries into allegations of discrimination in an effort to resolve the matter in a way that is fair to all parties involved before a complaint is filed.

**An aggrieved person must consult with an EEO Counselor within 45 days of an alleged discriminatory act, the effective date of a personnel action, or date the person knew or reasonably should have known of the discriminatory act or personnel action.**  Rosters of the EEO Counselors, both domestic and overseas, are maintained by the Office of Civil Rights and are also available by visiting our website (**socr.state.gov**).  The domestic roster is also included in the Department telephone book. These rosters are updated annually, disseminated throughout the Department and posted in prominent places.

If an aggrieved person decides to pursue pre-complaint counseling, the EEO Counselor will make inquires to determine the facts and attempt to resolve the matter informally.  If the matter is not resolved within 30 days, the aggrieved person will be issued a written notice advising of the right to file a discrimination complaint.

**Note:** **The Pre-complaint counseling period may be extended for up to an additional 60 calendar days. However, any extension must be in writing and requires the mutual agreement of the aggrieved person and S/OCR's ADR/EEO Counseling/Training Section.**

If the aggrieved person has not been notified of the right to file a discrimination complaint and an extension of time has not been agreed upon, the aggrieved person has the right to file a formal complaint after the 30th day even without notification from the counselor.

## S/OCR's Alternative Dispute Resolution (EEO/ADR)

The Department's Office of Civil Rights Alternative Dispute Resolution  (EEO/ADR) mediation process is not designed to replace the administrative EEO process but to provide an alternative or choose.  EEO Counselors are required to advise the aggrieved person in writing that he/she may choose between participation in S/OCR's EEO/ADR mediation process or the administrative EEO process.

Information regarding S/OCR's Alternative Dispute Resolution (EEO/ADR) mediation process is available in the Office of Civil Rights Alternative Dispute Resolution Fact Sheet, on our website at **www.socr.state.gov** and by contacting S/OCR's ADR/EEO Counseling/Training Section at (202) 203-7134 or (202) 203-7141.

## Filing A Complaint of Discrimination

If an aggrieved person elects to file a formal complaint, it must be filed in writing with the Department of State's Office of Civil Rights (S/OCR) within 15 calendar days of receiving the "Notice of Right to File a Discrimination Complaint" from an EEO counselor.  Only the matter(s) raised in per-complaint processing may be alleged in a formal EEO complaint filed with the Department.

The Office of Civil Rights will acknowledge receipt of an EEO complaint in writing. S/OCR also informs the complainant of the issue(s) accepted for further processing by a separate letter.  However, if the complaint is dismissed, the complainant is notified in writing of the right to appeal to the Equal Employment Opportunity Commission (EEOC), Office of Federal Operations, within specified time limits established by EEOC's regulations.

## Investigation of A Discrimination Complaint

 S/OCR's Complaints Management Section is required to conduct a complete and impartial investigation of an EEO complaint in within 180 days from the date the complaint was filed.  An EEO Investigator gathers evidence from the complainant and witnesses relevant to the accepted issues in accordance with guidance from EEOC. Statements made by witnesses shall be made under oath or affirmation or, alternatively, by written statement under penalty of perjury.

By written mutual agreement and within the time limit authorized by regulation, the complainant and S/OCR may voluntarily extend the time period for the investigation an additional 90 days.

Provided the complainant is notified, S/OCR may unilaterally extend the 180-day time limit, or any period of extension, for not more than 30 days when it is necessary to sanitize a complaint file that contains information classified, pursuant to Executive Order 12958.

## Complainant's Responsibilities

- To keep the Department informed of his/her current mailing address during the administrative processing of an informal or formal complaint.

- To provide a copy of appeal papers to the Assistant Secretary for S/OCR at the time that he/she files an appeal with the Equal Employment Opportunity Commission (EEOC).  In or attached to the appeal to EEOC, the complainant must certify the date and method by which services was made on the Department of State.

## Complainant's Rights

- To receive a copy of the completed Report of Investigation (ROI).

- To be accompanied, advised, and represented at any stage in the complaint process, including the counseling stage.  The Office of Civil Rights must be informed immediately when counsel or a representative is retained.

- To choose to remain anonymous during the pre-complaint counseling process. Depending on the situation, anonymity may hinder resolution of the matter

- To request a hearing before an administrative judge, or waive that right and request a Final Agency Decision (FAD) from the Department within 30 days after receipt of a copy of the Report of Investigation and notification of 29 C.F.R. 1614 procedural rights and responsibilities.

- To request a hearing at any time after 180 days have elapsed from the filing of the complaint.

- To representation, generally participants in the discrimination complaint process, including complainants, managers, supervisors, and witnesses, have the right to representation at any stage of the process.  No one however, has the right to representation provided by the Department of State.  Only the parties – the

- 20 -

Department and the Aggrieved Person/Complainant – have the right to have their representatives participate in the EEO/ADR or hearing proceedings.

## Election of Remedies

### Employees Covered by Collective Bargaining Agreements

Employees subject to 5 U.S.C. Section 7121(d) or 22 U.S.C. 1101, *et seq*., and covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure must elect initially to pursue a matter that is both grievable and allegedly discriminatory through either the negotiated grievance procedure or the discrimination complaints process, but not both. The following unions have been granted exclusive recognition by the Department:

- **American Foreign Service Association (AFSA**) represents all Foreign Service employees worldwide, except Foreign Service Nationals (FSNs).

- **American Federation of Government Employees (AFGE**) **Local 1534** represents Civil Service employees of the Office of Multi-Media Services, language and cultural instructors of the Foreign Service Institute, and employees in profession job occupational series in the Washington Metropolitan area. **(AFGE**) **Local 1534** also represents Civil Service employees of the Department who are employed in the Washington Metropolitan area, excluding supervisors, mangers, and employees otherwise covered by an exclusive representative.

- **National Federation of Federal Employees (NFFE) Local 1998** represents Passport Service employees nation-wide.

- **National Federation of Government Employees (AFGE) Local 3309** represents Visa Examiners in Juarez, Mexico.

- **National Federation of Government Employees (AFGE) Local 3273** represents Visa Examiners in Tijuana, Mexico.

An aggrieved employee who files a discrimination complaint may not thereafter file a grievance on the same matter. Likewise, an aggrieved employee who files a grievance alleging discrimination may not file a discrimination complaint on the same matter. A Civil Service (CS) grievant has the right to appeal to the EEOC from a final arbitration decision. Foreign Service grievants have the right to go directly to the U.S. District Court.

## Mixed Cases

"Mixed cases" contains allegations of discrimination and employment actions that can be appealed to the Merit Systems Protection Board (MSPB): (e.g., removals, "Mixed cases" contains allegations of discrimination and employment actions that can be appealed to the Merit Systems Protection Board (MSPB): (e.g., removals, demotions, suspensions for more than 14 days, reductions-in-force, and furloughs for less than 30 days) was motivated by illegal discriminatory animus, such a complaint is known as a "mixed case." An aggrieved employee may initially file a mixed case complaint with the agency or an appeal on the same matter with the MSPB, pursuant to 5 C.F.R. 1201.151, but not both. The process selected first is considered the elected process. An aggrieved person has 20 days from the date of the alleged discriminatory act to file a mixed case appeal with the MSPB or 15 days from the date of an EEO Counselor's "Notice of Right to File a Discrimination Complaint" or 30 days after the initial EEO Counselor contact to file a formal mixed case complaint through the Department's formal EEO process.

## Age Discrimination

It should be noted that under the Age Discrimination in Employment Act of 1967 (ADEA), an aggrieved person may file either a discrimination complaint or file a civil action in a U.S. District Court. However, the aggrieved person must give the Equal Employment Opportunity Commission (EEOC) not less than 30 days notice of intent to file such action. The notice must be filed in writing within 180 days of the occurrence of the alleged discriminatory practice.

## Equal Pay Act Complaints

The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963 (EPA) prohibits sex-based wage discrimination. The EPA addresses the issue of one sex being paid less wages than those of the other sex for performing substantially equal work. "Substantially equal work" refers to jobs that require equal skills, effort, and responsibility when the jobs are performed under similar working conditions. EPA complaints do not address whether two jobs, which may be similar in function or contribution but require different skills, effort, and responsibility, are actually of "comparable worth."

EPA claims of wage discrimination are processed as claims of discrimination based on sex under the discrimination complaints process. The complainant retains the option of bypassing the administrative complaints process and proceeding directly to U.S. District Court.

## Class Complaints

A "class" is defined as a group of similarly situated persons who allege to have been adversely affected by an agency personnel policy or practice which discriminates against the group on the basis of their common characteristics, e.g., race, color, religion, sex, national origin, age, or disabling condition.

Class complaints are subject to scrutiny to determine whether the allegations at issue are appropriate for class rather than individual complaint processing.

Employees or applicants who wish to file a class complaint must first contact an EEO Counselor within 45 days of the date that the specific policy or practice adversely affected the class agent, or if a personnel action, within 45 days after its effective date.  In presenting a class complaint, the class agent or representative must identify the policy or practice adversely affecting the class as well as the specific action or matter affecting the class agent.

## Civil Action

A complainant who has filed an individual complaint, an agent who has filed a class complaint, or a claimant who has filed a claim for individual relief pursuant to a class complaint may file a civil action in an appropriate United States District Court when the following conditions and time limits are met:

- Within 90 days of receipt of the Final Agency Decision (FAD) on an individual or class complaint if no appeal has been filed with the EEOC;

- Within 90 days of receipt of the Final Agency Decision (FAD) on an individual or class complaint if no appeal has been filed with the EEOC;

- After 180 days from the date of filing an individual or class complaint, if no appeal has been filed with the EEOC;

- Within 90 days of receipt of the EEOC's Final Decision on an appeal; or

- After 180 days from the date of filing an appeal with the EEOC, if there has been no Final Decision on the appeal.

- 23 -

**Questions concerning the discrimination complaint process should be addressed to:**

*U.S. Department of State*
*Office of Civil Rights*
*ADR/EEO Counseling/Training Section*
*HST Bld., Rm. 7428*
*2201 C St., N.W., Washington, D.C. 20520*

*(202) 647-9295 or (202) 647-8103*
*Fax: (202) 647-4969*

- 24 -

(Rev. 4/03).

US Department of State

CLASSIFICATION: UNCLASSIFIED

This e-mail is unclassified based on the definitions provided in E.O. 12958.

---

**From:** Canton, Jacqueline A
**Sent:** Friday, April 28, 2006 11:33 AM
**To:** Stanley, Dumar G
**Cc:** Whitlock, Darlene B (S/OCR)
**Subject:** RE: Status of EEO Counseling on Intisar Na'im - Date Assigned 3/6/2006

Dumar,

You **must not** issue the Notice of Right to File until you have completed all counseling activities which include meeting wit
the aggrieved and management. You do not have to contact management if the aggrieved elects mediation. Please
remember that you as the EEO Counselor control the process. When the aggrieved states that they want to go "Formal",
you must remind them of the full informal process and your role. In addition, **you must** have Ms. Na'im agree to an
extension of time to complete the counseling. If she does not agree, you must issue the Notice. Also, please **make sure**
that you fill out all forms or notices appropriately. If you have any questions, please do not hesitate to contact Darlene
Whitlock or me. Thank you.

Jacqueline A. Canton, Chief
ADR and EEO Counseling Section
U.S. Department of State
2201 C St., NW, Room 7428
Washington, D.C. 20520
Direct Tel: (202) 647-8103
Main Tel: (202) 647-9295
Fax: (202) 647-4969

---

**From:** Stanley, Dumar G
**Sent:** Friday, April 28, 2006 11:02 AM
**To:** Canton, Jacqueline A
**Subject:** RE: Status of EEO Counseling on Intisar Na'im - Date Assigned 3/6/2006

Jacqueline—I will be meeting with Ms. Intisar Naim today at 5:00pm to discuss her case. She has informed me that she
want to go formal with her case. I will provide her with " Notice of Right to File a Complaint". She has agreed to complete
this form today during our meeting. I will write my final report and have it ready for your review by Tuesday of next week. I
have a large amount of documentation concerning her case which I will forward to you on Tuesday.

Dumar G. Stanley  CISSP CAP
EAP Domestic Systems Manager/ISSO
202-647-9324
US Department of State

CLASSIFICATION: UNCLASSIFIED

This e-mail is unclassified based on the definitions provided in E.O. 12958.



EXHIBIT

K

2

**From:** Canton, Jacqueline A
**Sent:** Thursday, April 27, 2006 12:23 PM
**To:** Stanley, Dumar G
**Cc:** Whitlock, Darlene B (S/OCR)
**Subject:** Status of EEO Counseling on Intisar Naim - Date Assigned 3/6/2006

Good Afternoon Dumar,

On 3/6/2006, you were assigned the above mentioned complaint to conduct counseling. As it is now more than 30 days from the date assigned, please provide us with a status on this case by April 28th. If you have not obtained an extension of time, you must issue the Notice of Right to File and submit the report within 10 days of the date the Notice was issued. Do not provide Ms. Na'im a copy of the report. It must be reviewed in S/OCR before a copy is provided. Your full cooperation and assistance is greatly appreciated. If you have any questions, please do not hesitate to contact Darlene Whitlock or me.

Jacqueline A. Canton, Chief
ADR and EEO Counseling Section
U.S. Department of State
2201 C St., NW, Room 7428
Washington, D.C. 20520
Direct Tel: (202) 647-8103
Main Tel: (202) 647-9295
Fax: (202) 647-4969

Response to Memorandum of Counseling/Impending Performance
Improvement Plan (PIP)
Of August 28, 2005 and Issues related to the Production of my Case work,
Work performance, and Distribution/Receipt of cases for processing, etc.

In response to the August 25, 2005 meeting with Charlene W. Thomas and
Tasha Thian, with A-Bureau Human Resources Personnel Specialist Lisa
Bell in attendance, herein are the weekly work reports as verified by the
"FREEDOMS" data sheets provided by Tasha Thian, and my further
analysis and tally, for the periods between January 1, 2005 through July,
2005, and related information corresponding to the Memorandum of
Counseling.

And, as per the discussion with Charlene W. Thomas and Mary T. Casto in
the Friday, January 13, 2006, at approximately 11:15a.m., included are the
weekly work reports for August 1 through October 31, 2005.

In that meeting, Charlene informed me that I will be placed on a
Performance Improvement Plan (PIP) due to the fact that I did not make my
production/quota of 12 or more cases weekly as per our Job Element 2
which states "When assigned, (the analyst) handles an average of 12 initial
processing cases weekly…" She said that I will be placed on the PIP for
case processing under Tasha Thian from January 1, 2005 through October
31, 2005.

I maintained and I reiterate that I have not always received this 12 case total
in a manner by which I could produce/make my 12-case quota on a weekly
basis.

EXHIBIT

ALL-STATE LEGAL®

1

The following table illustrates the total of cases I received for each month during the PE year 2005 on a bi-weekly basis including the period of assignment, number of cases assigned monthly, and in instances where I had validity letters, numbers of these as well. Copies of the weeklies which also include the day of the week that I received the majority of my cases, and number of cases in Q.C., are also enclosed for your reference:

| Month | Dates Assigned | 1st ACK Ltr | 2nd ACK Ltr | Cases assigned. |
|---|---|---|---|---|
| January, 2005 | 1/3/05-1/31/05 | 9 | 0 | I case assigned |
| February, 2005 | 2/4/05-2/28/05 | 9 | 0 | 22 cases assigned for the month |
| March, 2005 | 3/7/05-3/28/05 | 14 | 01 | 16 cases assigned for the month |
| April, 2005 | 4/4/05-4/29/05 | 25 | 0 | 2 cases assigned for the month |
| May, 2005 | 5/2/05-5/31/05 | 39 | 1 | 25 cases assigned for the month |
| June, 2005 | 6/1/05-6/30/05 | 3 | 9 | 29 cases assigned for the month |
| July, 2005 | 7/4/05-7/29/05 | 20 | 1 | 22 cases assigned for the month |
| August, 2005 | 8/1/05-8/31/05 | 28 | 0 | 22 cases assigned for the month |
| September, 2005 | 9/1/05-9/30/05 | 22 | 6 | 43 cases assigned for the month |
| October, 2005 | 10/3/05-10/31/05 | 17 | 11 | 0 cases assigned for the month |

for the month of July. As it was estimated by Charlene and Tasha that I *should have produced at least 39 cases in 3.33 hours. Please be* advised as per the above table, I received only 22 cases for the month of July, and I processed approximately 20 of these as indicated in "Freedoms." I processed the cases that I received. When I was given back cases for revisions and instructed to change the clearance date, these cases added to the total of cases I processed/sent out for the given month.

- As for the calculation cited for the hourly processing of a FOIA/PA case, it is herein noted that this is the first time that I was made aware of this formula. Neither of you certainly brought forth such estimation in the meetings in March and August. Nor have you discussed this requirement out in the open in office meetings so that everyone is made aware of these expectations. Furthermore, given that every FOIA and PA case is different, it is difficult to put a blanketed time frame on them i.e. one FOIA case may be routine with a simplistic straight forward process requirement, whereas, another could require extensive time to do research, contact other FOIA liaisons, etc. in order to process/complete the case. IPS managers as well as analysts are well aware of this situation. I would like to assume that the same hourly production standard is being applied to the process of clearing the cases that the analyst puts into Q.C.

- Again, my calculation indicated that I processed 28 cases for the month of August, although 22 cases were assigned to me for the whole month. This indicates that I have been working with a back log of only 8 cases, as during some weeks of the month, as my weekly for 8/8/05-8/12/05 and 8/15/05-8/19/05 indicated that I received no new cases for these two weeks respectively. Yet, I continued to produce case work from the cases that I did receive. For instance, I put 17 cases into clearance (Q.C.) during the week of 8/1/05-8/5/05, and they remained there uncleared for a period of time before Tasha returned them to me. Moreover, this illustrated that I was producing cases, and putting the work into Q.C. Nevertheless, because the cases hadn't gone out to requesters, I am to assume that the blame for the non-productivity falls back upon me. If I am not mistake, in the 9/2/05 meeting Charlene said that I am responsible for getting 12 cases into the mail on a weekly basis/meeting my 12 cases a week quota.

- Once the analyst put the work into Q.C., s/he has no further control on when the work goes out or on the productivity level of the case processing. Therefore, I respectfully disagree with the assessment by IPS management that my productivity/performance continued at an unsatisfactory/unacceptable level.

- As for the accurate reporting of my cases, maintaining of better organized case files, and employing better judgment in case prioritization, I again, respectfully disagree.

- I explained to Charlene and Tasha that I prioritized the processing of the newer FOIA/PA cases she gave me during the month of August, and put aside the returning cases in order to increase my case productivity. I added that I did not want to fall behind in production while continually revising again and again cases that I'd given her weeks earlier. In some instances she'd given me cases back weeks later that had had minor corrections. I was required to stop processing the newer cases, correct/revise these cases, some of which had minor errors that she'd passed off as acceptable in other FOIA/PA cases I'd given her in the past, while the newer cases remained unprocessed. Thereby inadvertently increasing my backlog of unprocessed cases.

- As for the organization of my case files, and the 15 acknowledgment letter/cases in question that I sent to the requesters during the 8/8/05-8/12/05, the package I presented in the 9/2/05 meeting were not duplicates, but attached copies of the acknowledgment letter in various stages of revision/updating. I attach the returning "file copy" with the supervisor's commentary onto my copies of the original acknowledgment letter, and once it clears, I make a copy of the "file copy" clear, final original acknowledgment letter going to the requester, a copy of his/her original inquiry letter, and all related attachments, and put the "Freedoms" report-7, Identity field report, and commentary on top of it in that order. This is what I presented to Charlene and Mary in the meeting.

- In reference to Tasha's August 23, 2005 e-mail, (a copy is enclosed for your reference) in which it was insinuated that I "double counted" the acknowledgment letters sent to requesters for the weekly work report of 8/8/05-8/12/05, enclosed for your reference is the post-it-note indicating that I sent out the following acknowledgment letters to requesters with the Q.C. dates in parenthesis on 8/11/05: 200503058 (7/15/05) 200502932. 200502931. 200502934. 200502933 (8/4/05) 200502692, 200502753, 200502694 (7/11/05) 200503033, 200503064, 200503069, 200502866, 2005002861(7/29/05) & 200502930, 200502937 (8/11/05).

- Because I received a large number of cleared cases from Q.C. all at one time, including cases from two different months, July and August, I physically sent out 15 cases for this work period. It has been my experience that cases haven't always come back to me during the actual weekly work reporting period that I put them into Q.C. Therefore, I haven't always made my quota for a particular work week. And, in some instances, when the case has come back, I had to change the send out date, although I may have written the letter up to a week or more before and put it into Q.C.

- 

- To further illustrate my point, I also enclose a copy of the "file copy" for FOIA case no. 200501183, ▮▮▮▮▮▮▮▮▮▮, Esq. for client, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I put this case into Q.C. on 4/7/05, Tasha had another analyst clear it on 4/8/05, then she cleared it again on 4/18/05 I received it back on 4/18/05, ten days later and sent it out on that date.

- As for my productivity, "Freedoms" indicates that as of 1/25/06, I processed a total of 231 cases from 1/1/05-12/31/05. I have both e-mails and verbal praise from IPS management indicating that I am making my production quota. And, I am getting the cases I need to so. Some of those e-mails are enclosed.


Enclosures:

> "Freedoms" Adhoc case list retrieved 1/25/06
> Weekly Work Reports for 1/1/05-10/31/05
> E-mails and memorandums to IPS managers requesting case work

| Case No. | Requester Name | IP Officer | Date Rec'd | Ack Ltr ( | Section |
|---|---|---|---|---|---|
| 00502897 |  | NAIMIR | 06-30-2005 | 08-23-2005 | RC |
| 00502908 |  | NAIMIR | 06-30-2005 | 08-19-2005 | WEP |
| 00502915 |  | NAIMIR | 06-30-2005 | 08-15-2005 | RC |
| 00502930 |  | NAIMIR | 07-06-2005 | 08-11-2005 | RC |
| 00502931 |  | NAIMIR | 07-06-2005 | 08-04-2005 | EAN |
| 00502932 |  | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502933 |  | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502934 |  | NAIMIR | 07-06-2005 | 08-04-2005 | RC |
| 00502937 |  | NAIMIR | 07-05-2005 | 08-11-2005 | RC |
| 60503000 |  | NAIMIR | 07-11-2005 | 08-26-2005 | RC |
| 00503027 |  | NAIMIR | 07-14-2005 | 08-15-2005 | RC |
| 50503033 |  | NAIMIR | 07-12-2005 | 08-08-2005 | RC |
| 50503058 |  | NAIMIR | 07-15-2005 | 08-08-2005 | MPD |
| 50503060 |  | NAIMIR | 07-15-2005 | 08-19-2005 | RC |
| 50503064 |  | NAIMIR | 07-13-2005 | 08-08-2005 | RC |

Can totals attached to Tasha's 12/2006 memo received by me in the "PIP" session of 3/9/06 - please note the change in my 2005 case totals from

1/25/06 at 231 } Freedoms
2/8/06 at 162 } reports enclosed in the EEO 3/7/06 package.