# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTISAR R. NA'IM                                :
                                                :
        Plaintiff,                              :        Civil Action No.:    06-2237 (RMU)
                                                :
        v.                                      :        Re Document No.:  28
                                                :
HILLARY R. CLINTON,[1]                          :
in her official capacity as Secretary           :
of the U.S. Department of State,                :
                                                :
        Defendant.                              :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION  FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the court on the defendant's motion for summary judgment.  The plaintiff claims that during her tenure of employment with the defendant, her supervisors discriminated against her on the basis of her race by fostering a hostile work environment and by retaliating against her for exercising her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[2]  Prior to discovery, the court granted partial summary judgment in the defendant's favor.  The defendant asserts that now, even with the benefit of ample discovery, the plaintiff has failed to raise a genuine issue of material fact with respect to her remaining claims.

The court concludes that although the plaintiff has offered some evidence suggesting that she may have been treated unfairly by her supervisors, she can point to no facts indicating that

---

[1]     The court substitutes current Secretary of State Hillary Clinton for the original named defendant, former Secretary of State Condoleezza Rice.  *See* FED. R. CIV. P. 25(d) (stating that an "officer's successor is automatically substituted as a party" when the officer ceases to hold office).

[2]     The plaintiff initially asserted claims for disparate treatment, hostile work environment and retaliation.  *See generally* Pl.'s Compl.  In a prior ruling, the court granted summary judgment to the defendant on the disparate treatment claim.  *See* Mem. Op. (Sept. 22, 2008) at 14-17.

this treatment was linked in any way to her membership in a protected class.  Furthermore, the plaintiff has failed to raise a genuine issue of fact regarding whether the retaliation to which she was allegedly subjected was materially adverse and causally connected to her involvement in a protected activity.  Accordingly, the court grants the defendant summary judgment.

## II.  BACKGROUND

### A.  Factual Background

The plaintiff, an African American woman, began working for the U.S. State Department ("DOS") in 1990.  Pl.'s Opp'n at 1-2.  By 1999, the plaintiff had risen to the position of Information Analyst in the DOS Office of Information Resources and Management Programs and Services, Requester Liaison Division ("IPS") and had achieved the GS 12 step 5 grade level.  *Id*. at 2.  As an analyst, her principal duties included reviewing and processing information requests brought under the Freedom of Information Act and the Privacy Act.  *Id*.  The plaintiff alleges that from 2001 until she left the DOS in 2006,[3] her supervisors took numerous hostile actions against her that were unjustified, discriminatory and designed to punish her for exercising her rights under Title VII.  *See generally id*.

The plaintiff alleges that in 2001, IPS Department Chief Margaret Grafeld made highly derogatory comments about her during the renewal of the plaintiff's government security clearance.  *Id*. at 2.  Specifically, the plaintiff alleges that Grafeld told government investigators that the plaintiff's co-workers feared for their safety because they believed she was a "violent

---

[3]     In her complaint, the plaintiff alleges that in 1999, her supervisor made racially derogatory comments about her during an evaluation of her candidacy for a promotion.  Compl. ¶ 7.  The plaintiff, however, conceded during her deposition that these comments were not "racial" in nature.  Pl.'s Opp'n, Ex. 1 at 28-29 ("I'm not alleging that [the comments] were racial.  I'm alleging that they were derogatory and denigrating").  The plaintiff does not address this allegation in her opposition papers.  *See generally* Pl.'s Opp'n.

individual" who could bring a gun to work and "go[] postal" and that she "rambled on and on in an interview for a job."[4]  *Id*., Ex. 1 at 10.  The plaintiff alleges that as a result of the comments made by Grafeld, she was directed to undergo psychological testing in June 2001.  *Id*. at 2.

In September 2001, the plaintiff filed an informal Equal Employment Opportunity ("EEO") complaint against Grafeld.  *Id*.  The plaintiff alleged that Grafeld had created a hostile work environment by making "racially derogatory comments" about the plaintiff's personal appearance,[5] failing to provide timely performance evaluations, giving the plaintiff unwarranted low performance ratings and portraying the plaintiff in a demeaning and negative light professionally.[6]  *Id*.  The plaintiff contends that during the subsequent mediation proceedings, Grafeld repeated the accusations she had made to government investigators regarding plaintiff's mental instability.  *Id*., Ex. 1 at 10-11.

In April 2001, Tasha Thain replaced Grafeld as the plaintiff's primary supervisor.  *Id*. at 3 & Ex. 2 at 31.  Thain was aware when she took over the position that the plaintiff's prior supervisor had felt threatened by her and that the plaintiff had a pending EEO complaint.  *Id*. The plaintiff alleges that like her predecessor, Thain "adopted the office conventional wisdom that [the plaintiff] was a homicidal psychopath" and began making highly demeaning comments about the plaintiff to others in the office.  *Id*.  Thain allegedly stated to others that the plaintiff was "anti-social," that she "barricaded" herself in her office and that other co-workers were

---

[4]     The plaintiff discovered these comments in March 2003 through a Privacy Act request for her personnel records.  Pl.'s Opp'n at 4.

[5]     Although the plaintiff does not specify the nature of these racially derogatory comments, it appears that this allegation refers to a comment allegedly made by Grafeld shortly after the plaintiff joined the DOS in 1990 in which she described the plaintiff's hair as "kinky-curly."  *See* Def.'s Statement of Material Facts ("Def.'s Statement") ¶¶ 11-12; Pl.'s Statement of Material Facts (Pl.'s Statement") ¶¶ 11-12.

[6]     It appears that the parties resolved the informal EEO complaint through mediation, and the plaintiff signed a "Mediated Settlement Agreement."  Def.'s Mot. at 10.

"intimidated" by her "pathologically loud voice" and were concerned about her "psychological stability." *Id*.

In her 2001 performance review, Thain gave the plaintiff a "Fully Successful" rating. *Id*. at 3-4. Thain, however, testified during her deposition that while she considered the plaintiff's performance during 2001 to be "Unacceptable," she nonetheless assigned the plaintiff a "Fully Successful" rating in part because she was advised that a lower rating could result in a retaliation claim in light of the plaintiff's pending EEO action. *Id*., Ex. 2 at 31-33. On or around May 10, 2002, the plaintiff filed an informal EEO complaint against Thain, alleging that Thain improperly downgraded her performance ratings in 2001. *Id*. at 4. The record does not indicate whether the plaintiff took any further action regarding this complaint. *See generally* Pl.'s Opp'n; Pl.'s Statement.

In May 2002, the plaintiff applied for a vacant GS 13 position. Pl.'s Opp'n at 4. The plaintiff alleges that although she was certified as a qualified candidate, Thain did not recommend her for the promotion. *Id*. at 4 & Ex. 2 at 102-03. As a result of her non-selection, the plaintiff filed another informal EEO complaint in January 2003. *Id*. at 4.

In August 2003, Thain recommended that the plaintiff be placed on a Performance Improvement Plan ("PIP") because she allegedly had been failing to meet her weekly case processing quota. *Id*. at 5. Thain also gave the plaintiff an "Unacceptable" performance rating for 2003. *Id*. at 5 & Ex. 2 at 53-54. The plaintiff objected to the PIP and the performance rating, contending that she had not been given enough cases to meet her weekly quota and that at any rate, she had successfully processed 308 cases against an annual goal of 300. *Id*. at 5. The plaintiff alleges that ultimately, Thain's supervisor, Audrey Holton, rescinded the PIP and

determined that the plaintiff's performance rating was unwarranted and should be changed from "Unacceptable" to "Fully Successful." *Id*. at 5; Def.'s Reply at 12.

Nonetheless, Thain withheld the plaintiff's regular within grade salary increase for that year because of her unacceptable performance.[7] Pl.'s Opp'n at 6. Moreover, from December 2004 until March 2005, Thain ordered the plaintiff to attend twice-weekly "coaching sessions" ostensibly designed to improve her work performance. *Id*. at 6. The plaintiff alleges that although her performance was comparable to that of her co-workers, no one else on the staff was required to attend coaching sessions of this kind. *Id*. In 2005, Thain again placed the plaintiff on a PIP. *Id*. at 6-7.

The plaintiff alleges that in 2004, she was verbally assaulted by a co-worker while entering the DOS building. *Id*. at 6. Despite the fact that this assault was completely unsolicited, Thain initially prepared a written reprimand for the plaintiff.[8] *Id*. at 6. Thain also refused to support the worker's compensation claim filed by the plaintiff after she fell outside the DOS building. *Id*. at 7.

Sometime in late 2005, Charlene Thomas took over as the plaintiff's supervisor. *Id*. In January 2006, the plaintiff was again placed on a PIP. *Id*. The plaintiff filed her final informal EEO complaint on March 16, 2006. *Id*. Ten days later, the plaintiff left IPS for a position at the United States Passport Office, where she took a $10,000 per year pay reduction. *Id*.

## B. Procedural History

The plaintiff filed a complaint in this court on December 28, 2006, alleging disparate treatment, hostile work environment and retaliation. *See generally* Pl.'s Compl. On September

---

[7]     The plaintiff protested the withholding of the salary increase and eventually won a retroactive increase. Pl.'s Statement ¶¶ 44-45.

[8]     Thain rescinded the reprimand after learning that the co-worker's behavior had been unsolicited. Pl.'s Statement ¶ 43.

21, 2007, the defendant filed a pre-discovery motion for summary judgment. *See generally*

Def.'s Mot. for Summ. J. (Sept. 21, 2007). The plaintiff opposed summary judgment and filed a

motion for discovery pursuant to Federal Rule of Civil Procedure 56(f). *See generally* Pl.'s

Opp'n to Def.'s Mot. for Summ. J. (Oct. 26, 2007). The court granted summary judgment to the

defendant on the plaintiff's disparate treatment claims, holding that the defendant's conduct was

not materially adverse. Mem. Op. (Sept. 22, 2008) at 2. The court, however, observed that a

reasonable jury potentially could infer a hostile work environment and retaliation from the

incidents alleged. *Id.* Accordingly, the court denied summary judgment as to these claims and

granted the plaintiff's motion for discovery. *Id.* The defendant now moves for summary

judgment on the plaintiff's remaining claims of hostile work environment and retaliation. *See*

*generally* Def.'s Mot.; Def.'s Reply.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are

"material," a court must look to the substantive law on which each claim rests. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary judgment motions in such cases with special caution.  *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

**B. The Plaintiff's Hostile Work Environment Claim**

**1. Legal Standard for Hostile Work Environment**

Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, or national origin.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Toward that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Such an environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir 2003) (quoting *Meritor*, 477 U.S. at 65, 67).  On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview."  *Harris*, 510 U.S. at 21.  Thus, to determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.  *Id.* at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeal

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

### 2. The Court Grants Summary Judgment to the Defendant
### on the Plaintiff's Hostile Work Environment Claim

The defendant asserts that the court should grant summary judgment on the plaintiff's hostile work environment claim because she has presented no evidence of discriminatory intimidation, ridicule or insult. *See* Def.'s Mot. at 4-16; Def.'s Reply at 4-15. The defendant argues that other than the "kinky-curly" comment allegedly made by Grafeld in 1990, the plaintiff has offered no evidence suggesting that any of the hostile actions of which she complains were in any way linked to the plaintiff's race. *See* Def.'s Mot. at 4-16; Def.'s Reply at 4-15.

The plaintiff responds that her supervisors fostered a work environment in which she was "to be scorned, detested and unworthy of basic respect." Pl.'s Opp'n at 10. The plaintiff contends that she was repeatedly singled out and placed on unwarranted PIPs, given unjustified poor evaluations and forced to endure humiliating "coaching sessions" to improve her work performance. *Id.* at 10-11. Moreover, the plaintiff alleges that although few of the insults and humiliations she suffered expressly focused on her race, a reasonable jury could nonetheless infer racial discrimination from her supervisors' comments that she was "loud," "confrontational" and possessed a capacity for violence. *Id.* at 11. Specifically, the plaintiff contends that "[g]iven the prevailing stereotype of African-Americans generally, and the supposed 'angry black wom[an]' in particular, [the plaintiff] was hardly imprudent to believe that her colleagues' unease with her natural speaking voice, coupled with the bizarre charges of her capacity for violence, was rooted in an unfounded fear based on her race." *Id.* at 11-12.

The plaintiff has presented a long list of actions taken by her supervisors with which she takes issue. *See id.* at 2-7. Several of these purportedly hostile actions, such as withholding the

plaintiff's 2004 salary increase and requiring the plaintiff to attend special "coaching sessions" during work hours, had at least some tangible impact on the plaintiff's work life.  *See id.*

The plaintiff, however, has presented virtually no evidence suggesting any link between this allegedly hostile behavior and her race.  Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (upholding summary judgment on the plaintiff's hostile work environment claim in part because "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability"); *Kline v. Springer*, 602 F. Supp. 2d 234, 243 (D.D.C. 2009) (granting summary judgment to the defendant on a hostile work environment claim because almost none of the comments relied on to support the claim had any direct connection to the plaintiff's race or sex and most of the comments were "completely unconnected to impermissible motive"); *Chaple v. Johnson*, 453 F. Supp. 2d 63, 73-74 (D.D.C. 2006) (observing that "[i]t must be clear that the hostile work environment was the result of discrimination based on a protected status") (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999)); *Nichols v. Truscott*, 424 F. Supp. 2d 124, 139-40 (D.D.C. 2006) (granting summary judgment to the defendant on a hostile work environment claim because "[o]nly a handful of the comments (and none of the conduct) by [the] plaintiff's co-workers could have been even remotely linked to [the] plaintiff's membership in a protected class" and "[t]hese isolated statements, while no doubt offensive to the plaintiff, simply are not 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' on the basis of the plaintiff's race or sex"); *Nurriddin v. Goldin*, 382 F. Supp. 2d

79, 108 (D.D.C. 2005) (observing that incidents bearing no relation to the plaintiff's protected class cannot be used to support a hostile work environment claim).

As in the above cases, none of the actions that the plaintiff complains of here expressly focused on her race. *See generally* Pl.'s Opp'n at 2-7.  Nearly all of these actions, such as the multiple PIPs, poor performance evaluations and the requirement that she attend coaching sessions, were explicitly tied to job performance issues – namely, errors in her work product and her alleged failure to meet case processing quotas. *See* Def.'s Mot. at 9-16.  Although the plaintiff contends that these job performance criticisms were unwarranted, Pl.'s Opp'n at 2-7, she fails to articulate how these actions were *discriminatory* in nature, *see generally id*.

The only hostile actions that the plaintiff alleges touched on her race were the comments accusing her of being loud and potentially violent, and the statement by Grafeld in 1990.  *See* Def.'s Statement ¶¶ 7-9; Pl.'s Statement ¶¶ 7-9; Pl.'s Opp'n, Ex. 1 at 6-10, 30-31.  The plaintiff, however, has offered no evidence indicating that these statements were frequent, widely disseminated or otherwise pervasive.  *See generally* Pl.'s Opp'n.  To the contrary, Thain's comment that the plaintiff was loud occurred in January 2002, Def.'s Statement ¶¶ 8-9; Pl.'s Statement ¶¶ 8-9, and the plaintiff testified that other than that comment, Thain made no other statements about the plaintiff, either directly or to others at IPS, that she considered racially offensive.[9] *Id*., Ex. 1 at 6-9.  Similarly, other than the 1990 comment about the plaintiff's hair and the comments accusing the plaintiff of being mentally unstable and potentially violent,

---

[9]     Indeed, regarding the comments made by Thain to others that she was "anti-social" and barricaded herself in her office, the plaintiff remarked that "[w]e can take the race out of it, just offensive, period, character assassinations, disrespect of another person's character." *Id*., Ex. 1 at 7.  The plaintiff may not rely on incidents that she did not experience as being racially discriminatory to support her claim. *See Washington v. Chao*, 577 F. Supp. 2d 27, 43 (D.D.C. 2008) (observing that the lack of evidence giving rise to an inference of racial discrimination was underscored by "Plaintiff's testimony indicating that he ascribes no racial motivations to [his supervisor's] conduct").

Grafeld made no other comments that she considered racially offensive.  *See* Def.'s Statement ¶ 7; Pl.'s Statement ¶ 7; Pl.'s Opp'n, Ex. 1 at 30-31.

Thus, assuming for the moment that the statements at issue were in fact discriminatory, the plaintiff has adduced no facts suggesting that these isolated statements were sufficiently pervasive or severe to alter the terms of her employment.  *See Faragher*, 524 U.S. at 788 (observing that "'simple teasing' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"); *Tomasello v. Rubin*, 167 F.3d 612, 620 (D.C. Cir. 1999) (holding that summary judgment was appropriate because the nondiscriminatory memoranda and isolated comments were insufficient to support a claim of hostile work environment).

The court, however, declines the defendant's invitation to take "judicial notice" that calling a person "loud" cannot be a racially derogatory comment.  Def.'s Mot. at 8.  It should at this point be common knowledge that the most pervasive expressions of racial animus are often cloaked in neutral language.  Statements regarding an individual's personal appearance, work ethic or personality, for instance, while containing no overt references to the individual's race, can, in a broader context, be plainly understood expressions of racial hostility.

In this case, however, the plaintiff's deposition testimony reveals that she perceived a clear distinction between "racial" comments and other denigrating comments that she considered "character assassination."  *See* Pl.'s Opp'n, Ex. 1 at 7 (remarking that "[w]e can take the race out of it, just offensive, period, character assassinations, disrespect of another person's character"); *see also id.*, Ex. 1 at 28-29 (disavowing her prior allegation that Grafeld made "racially derogatory" comments about her in 1999 by testifying, "I'm not alleging that [the comments] were racial.  I'm alleging that they were derogatory and denigrating").  This testimony further

indicates that she did not perceive the statements that she was loud and potentially violent as drawing upon the stereotype of the "angry black woman" but rather as part of her supervisors' efforts to assassinate her character:

> Q     Was there anything else that constituted such character assassination?
>
> A     If it's been said I would barricade myself in a door in my office as Mrs. Thain told [others].  And that I'm antisocial and I don't get along with managers.  That is character assassination.  That has nothing to do with work or work performance.  That is painting me up as a difficult person and incompetency follows behind that.  The character assassination is that I would barricade myself in my office.  I have a loud voice.  I don't get along with managers.  I'm a difficult person."

*Id.*, Ex. 1 at 38.  Though the plaintiff testified at one point that the statement that she was "loud" "can be construed as being racist," *id.*, Ex. 1 at 8, she again quickly linked the statement to her supervisors' attacks on her character, testifying that "[s]he was as loud as I was.  But she [attributed] that to me.  Loud, incorrigible.  She didn't know me.  She knew nothing about my character to make those assessments."  *Id.*  Similarly, the plaintiff consistently characterized the other hostile actions taken against her as "character assassination,"[10] *id.*, Ex. 1 at 8-9, 38, and an assault on her professionalism and mental stability,[11] *id.*, Ex. 1 at 27.  This testimony indicates that the plaintiff herself perceived the vast majority of these hostile actions as attacks on her demeanor and character rather than attacks premised on her race.  *See generally id.*, Ex. 1.

---

[10]    Regarding the statements made by Grafeld to government investigators in 2001, the plaintiff testified that "[m]y character was assassinated.  They said I would take a gun and kill them and I was sent for psychological testing.  That had nothing to do with my work or performance.  That was an out and out character assassination.  It wasn't about my work performance.  It was about my character."  *Id.*, Ex. 1 at 38.

[11]    Regarding the statements made by Grafeld during the EEO mediation in 2001, the plaintiff testified that "[w]hen she read [aloud] the statement [that] I would take the gun and kill them – [that] denigrated my character and my professionalism and [suggested] I'm a crazy person."  *Id.*, Ex. 1 at 27.

Accordingly, the court concludes that although the plaintiff has offered some evidence suggesting that she may have been treated unfairly by her supervisors, she has failed to raise a genuine issue of fact regarding whether she suffered discriminatory hostility in her workplace sufficient to support a claim for hostile work environment.  The court therefore grants the defendant summary judgment on this claim.

### C.  The Plaintiff's Retaliation Claim

### 1.  Legal Standard for Retaliation

To prevail on a claim of retaliation, a plaintiff must follow the *McDonnell Douglas* framework.  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *Duncan v. Wash. Metro. Area Transit Auth.*, 214 F.R.D. 43, 49-50 & n.8 (D.D.C. 2003) (applying the *McDonnell Douglas* framework to a Rehabilitation Act retaliation claim).  The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of [retaliation].  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, [non-retaliatory] reason for the employee's rejection" . . . .  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation] . . . .  The ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged

action materially adverse,[12] and (3) there existed a causal connection between the protected

activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 67-69 (2006); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). The plaintiff's burden

is not great: he "merely needs to establish facts adequate to permit an inference of retaliatory

motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

If the employer successfully presents a legitimate, non-retaliatory reason for its actions,

"the presumption raised by the prima facie is rebutted and drops from the case." *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted); *Brady v. Office of the*

*Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting

that "the prima facie case is a largely unnecessary sideshow"). Upon such a showing by the

defendant, the district court need resolve only one question: "Has the employee produced

sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory]

reason was not the actual reason and that the employer intentionally [retaliated] against the

employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494.

In other words, did the plaintiff "show *both* that the reason was false, *and* that . . . [retaliation]

was the real reason." *Weber*, 494 F.3d at 186 (alterations in original and internal quotations

omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515). The court must consider whether the

jury could "infer [retaliation] from the plaintiff's prima facie case and any other evidence the

plaintiff offers to show that the actions were [retaliatory] or that the non-[retaliatory] justification

was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (quoting

---

[12]     In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of actions
than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C.
Cir. 2008). Thus, "[r]etaliation claims are 'not limited to discriminatory actions that affect the
terms and conditions of employment' and may extend to harms that are not workplace-related or
employment-related so long as 'a reasonable employee would have found the challenged action
materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68
(2006)).

*Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case. *Aka*, 156 F.3d at 1291.

The strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action.  *See id.* at 1289 n.4 (stating that "a *prima facie* case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment"); *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (holding that the plaintiff cannot establish pretext because "she is unable to show any causal connection"); *Meadows v. Mukasey*, 2008 WL 2211434, at *5-6 (D.D.C. May 29, 2008) (holding that the plaintiff demonstrated pretext in part by establishing a causal connection).  The plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity."  *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all").

### 2.  The Court Grants Summary Judgment to the Defendant on the Plaintiff's Retaliation Claim

The plaintiff bases her retaliation claim on the same incidents that she relies on in asserting her claims for disparate treatment and hostile work environment – that in retaliation for her involvement in EEO activity, Thain drastically downgraded the plaintiff's performance rating in 2003, withheld her 2004 within grade salary increase, placed her on unwarranted PIPs and

forced her to attend humiliating "coaching sessions."  Compl. ¶ 11; Pl.'s Opp'n at 12-16.  The

plaintiff further alleges that in retaliation for her EEO activity, she was subjected to "continued

and unjustified demeaning comments about her professional abilities, her personal character and

personal appearance by her supervisors and other agents of defendant."  Compl. ¶ 11.  The

plaintiff suggests that even if each of these discrete acts of retaliation is insufficient to survive

summary judgment, cumulatively they demonstrate that she was subjected to a hostile work

environment in retaliation for her protected activity.  *See* Pl.'s Opp'n at 12-16.

While there is no dispute that the plaintiff engaged in a protected activity when she filed

informal EEO complaints in September 2001, May 2002 and January 2003, *see generally* Def.'s

Mot.; Def's Reply, the defendant asserts that the court should grant summary judgment on the

retaliation claim because the plaintiff has adduced no facts suggesting a causal connection

between her protected activity and any of the adverse actions identified by the plaintiff.  *See*

Def.'s Mot. at 17-18.  The defendant further argues that to the extent the plaintiff claims that her

supervisors retaliated against her by creating a hostile work environment, the plaintiff has failed

to demonstrate that the harassment she suffered was sufficiently severe or pervasive to support

such a claim.  *Id*. at 17.

### a.  Discrete Acts of Retaliation

When viewed as discrete acts of retaliation, it is clear that several of the plaintiff's

allegations simply do not reflect "materially adverse" actions even under the broader definition

applicable in connection with retaliation claims.  *See Baloch*, 550 F.3d at 1198 n.4.  Thain's

attempts to place the plaintiff on a PIP in August 2003 and the poor performance evaluation

initially given to the plaintiff at the end of 2003 plainly were not materially adverse, as these

actions were overturned by Thain's supervisor, Audrey Holton, and there is no evidence that they

had any impact on the plaintiff's employment. *See More v. Snow*, 480 F. Supp. 2d 257, 273 n.7 (D.D.C. 2007) (holding that the plaintiffs failed to establish a prima facie case of retaliation because the actions complained of "were rescinded and [the] plaintiffs have produced no evidence that their pay, benefits, or privileges were in any way affected"); *see also Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (holding that a plaintiff claiming unlawful retaliation must demonstrate that the challenged action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'"). Similarly, Thain's initial decision to issue a reprimand to the plaintiff for the verbal altercation she had in 2004 outside the DOS building does not constitute a materially adverse action, as Thain rescinded the reprimand when she changed her mind regarding who was at fault. *See id.*

The plaintiff's remaining discrete allegations fail because they lack any causal connection to the plaintiff's protected EEO activity. The plaintiff has not offered any direct evidence regarding causal connection, *see generally* Pl.'s Opp'n, and thus her retaliation claim relies on the inference of such a connection based on temporal proximity. Yet the plaintiff's 2004 salary increase was withheld in February 2004, more than a year after her last EEO activity, which undermines any such inference.[13]  *See Breeden*, 532 U.S. at 273-74 (observing that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be 'very close'"); *Buggs v. Powell*, 293 F. Supp. 2d 135, 148 (D.D.C. 2003) (holding that the time lapse between the retaliatory action and the protected activity must be under three months to create an inference of causal connection);

---

[13]     Furthermore, the plaintiff acknowledges that the withholding was overturned and a retroactive increase awarded, Pl.'s Statement ¶ 44, indicating that the defendant successfully cured the adverse action prior to the litigation, *see Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (holding that "[a]n employer may cure an adverse employment action . . . before that action is the subject of litigation").

*Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2001) (noting that "[a]lthough courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length"). Similarly, the coaching sessions, which did not commence until December 2004, and the PIP imposed in late 2005 lack the requisite temporal proximity to establish causal connection standing alone. *See Brodetski*, 141 F. Supp. 2d at 43. Given the absence of direct evidence of retaliatory motive, the lack of temporal proximity between these actions and the protected activity undermines the plaintiff's assertion of causal connection.

As for the plaintiff's allegations regarding the demeaning comments, the record clearly reflects that these comments began *before* the plaintiff filed her first EEO complaint in September 2001. *See* Pl.'s Opp'n at 2-3. Grafeld began making negative comments about the plaintiff as early as 1999 during an evaluation of her candidacy for a promotion. *See id.*, Ex. 1 at 28-29. And as previously discussed, Grafeld made negative comments about the plaintiff's mental stability to government investigators in early 2001, prior to the filing of the September 2001 EEO complaint.[14] *Id.* at 2-3. In short, there is simply no evidence that these demeaning comments began shortly after the plaintiff engaged in protected EEO activity.

Nor has the plaintiff offered any evidence that the comments became more severe or pervasive after the commencement of her EEO activity in September 2001 or any of her subsequent EEO filings. *See Nichols*, 424 F. Supp. 2d at 141 (holding that the plaintiff failed to show any causal connection between her protected activity and the alleged harassment because the harassment began years before the plaintiff engaged in any protected activity and "there is no

---

[14]    In fact, Grafeld's alleged comments about the plaintiff's personal appearance formed part of the basis of the plaintiff's first EEO complaint. Pl.'s Opp'n at 2-3.

indication that it intensified (or that her supervisors were less inclined to rein it in) after [the] plaintiff initiated her protected activity").  In fact, the plaintiff has offered no evidence whatsoever concerning the frequency of the demeaning comments made by Thain, who became the plaintiff's supervisor in April 2001, or any other IPS supervisors.  *See generally* Compl.; Pl.'s Opp'n.  Thus, even if such demeaning statements were materially adverse for purposes of Title VII, they could not support a retaliation claim because there is no evidence that they were causally related to her protected EEO activity.  *See Nichols*, 424 F. Supp. 2d at 141.

In sum, none of the discrete acts of retaliation identified by the plaintiff is materially adverse and causally related to her involvement in protected activity.  Accordingly, when viewed as discrete acts, they do not raise a genuine issue of fact with respect to the plaintiff's retaliation claim.

### b.  The Plaintiff's Retaliation-Based Hostile Working Environment Claim

The fact that these discrete acts cannot support a retaliation claim, however, does not entirely foreclose the plaintiff's claim.  The plaintiff may still demonstrate that she was subjected to a hostile work environment in retaliation for her involvement in protected activity.  *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  To succeed on such a claim, the plaintiff must show that she was subjected to "'discriminatory intimidation, ridicule and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of . . . employment and create an abusive working environment.'"  *Id.*, 435 F.3d at 366.  Furthermore, the plaintiff must establish a causal connection between the harassment and her protected activity to succeed on the claim.  *See Nichols*, 424 F. Supp. 2d at 141.

The plaintiff rests her retaliation-based hostile work environment claim on precisely the same incidents she relied on in asserting her discrete claims of disparate treatment and

retaliation: one poor performance evaluation in 2003 (which was overturned), her placement on three PIPs (one of which was overturned), the withholding of her 2004 salary increase (which was overturned and retroactively applied), an unwarranted reprimand (which was withdrawn), an unspecified number of allegedly demeaning comments made by supervisors, extra "coaching sessions" and other miscellaneous incidents such as Thain's refusal to support her worker's compensation claim. *See* Pl.'s Opp'n at 2-7, 12-16. The plaintiff, however, has failed to indicate how these discrete incidents, which occurred over at least a five-year period, were connected in such a way that they formed a pervasive pattern of abuse. *See Tolson v. Springer*, 2009 WL 1314405, at *4 (D.D.C. May 13, 2009) (observing that "[a] plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected"); *Lester v. Natsios*, 290 F. Supp. 2d 11, 31-32 (D.D.C. 2003) (noting that "discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim" and that accordingly "it is not at all clear that mere reference to alleged disparate acts of discrimination . . . can ever be transformed, without more, into a hostile work environment claim"); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (observing that "[h]ostile work environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct" and "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day"). In light of the sporadic, discrete nature of the alleged hostile actions, these allegations "indicate[] less a pervasive pattern of harassment, and more just isolated employment incidents occurring over a long period of time." *Nurriddin*, 382 F. Supp. 2d at 108; *see Tolson*, 2009 WL 1314405, at *5 (holding that five discrete incidents of hostile behavior did not constitute a hostile work environment because there was no evidence in the record to tie any of these sporadic events to one another).

Moreover, there is a marked absence of "extreme conduct" accompanying the hostile actions identified by the plaintiff. *See Natsios*, 290 F. Supp. 2d at 31 (noting that the plaintiff's allegations must reflect "*extreme* conduct . . . to transform 'the ordinary tribulations of the workplace' into a legally cognizable hostile work environment claim") (citing *Faragher*, 524 U.S. at 787-88). There is no evidence that the PIPs or coaching sessions were implemented in a harassing or humiliating manner.[15]  *See generally* Pl.'s Opp'n.  To the contrary, the plaintiff testified that during the required coaching sessions, she was offered not only criticism but also praise for aspects of her work performance.[16]  Pl.'s Opp'n, Ex. 1 at 103.  While the plaintiff alleges that her supervisors failed to support her efforts to obtain a promotion in 2002 and worker's compensation benefits in 2005, she presents no evidence that her supervisors took any affirmative action to hinder these efforts. *See generally id*.  Furthermore, while the demeaning comments identified by the plaintiff may reflect some amount of disdain, she has offered no indication of how widely or frequently these comments were disseminated. *See generally id*. Under these circumstances, the plaintiff's work environment cannot reasonably be characterized as severely or pervasively discriminatory or abusive.[17]  *See Hussain*, 435 F.3d at 366-67 (holding that although the plaintiff's work environment "was hardly ideal" no reasonable jury could conclude that the actions complained of, which included denying him promotion, denying him

---

[15]     The plaintiff testified during her deposition that there were approximately eleven coaching sessions, each of which lasted approximately one hour.  Pl.'s Opp'n, Ex. 1 at 101-02.

[16]     When asked if the coaching sessions were ever helpful, the plaintiff testified that "[w]hen they praised my work and said I was on production, they were very helpful."  *Id*., Ex. 1 at 103.

[17]     For the same reasons, the court concludes that no reasonable jury could find that the plaintiff's working conditions were so intolerable or unbearable that she was constructively discharged from her position.  *See Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981) (holding that in order succeed on a claim for constructive discharge, a plaintiff must demonstrate the existence of working conditions so intolerable that a reasonable employee would have found remaining in the job unbearable).

medical leave, poor performance evaluations and threats of termination, constituted an abusive working environment).

Nor has the plaintiff offered any evidence suggesting a causal connection between the harassment she suffered and her involvement in protected EEO activity.  More than six months passed between the filing of the plaintiff's final EEO complaint in January 2003 and any incident of harassment and in total, only two such incidents occurred within one year of the plaintiff's protected activity (the August 2003 proposed PIP and the year-end performance evaluation, both of which were overturned).  *See Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61-62 (D.D.C. 2005) (concluding that a six-month lapse between the retaliatory action and the protected activity is insufficient to support a finding of causation on the basis of temporal proximity); *Buggs*, 293 F. Supp. 2d at 148 (holding that the time lapse must be less than three months to establish a causal connection).  The bulk of the incidents that the plaintiff deems harassing, such as the PIPs in 2005 and 2006, the coaching sessions and the failure to support her worker's compensation claim, occurred nearly two years after the plaintiff's final EEO activity.  *See* Pl.'s Opp'n at 4-7. Because the plaintiff has presented no direct evidence of retaliatory motive, the absence of temporal proximity undermines the plaintiff's claim that the alleged harassment was causally linked to her prior EEO activity.  *See Nichols*, 424 F. Supp. 2d at 141 (dismissing the plaintiff's retaliation-based hostile work environment claim because the plaintiff failed to demonstrate a causal connection between the hostile work environment and her involvement in protected activity).

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary

judgment.  An Order consistent with this Memorandum Opinion is separately and

contemporaneously issued this 19th day of June, 2009.


RICARDO M. URBINA
United States District Judge